# TURLEY | LAW FIRM

**WINDLE TURLEY**
CERTIFIED-PERSONAL INJURY TRIALS
**LINDA TURLEY**
CERTIFIED-PERSONAL INJURY TRIALS
**THOMAS B. COWART**
CERTIFIED-CIVIL APPELLATE LAW

**LORI A. WATSON**

**T NGUYEN**

**KATHLEEN M. KEARNEY**

**DAVID A. TIJERINA**

ESTABLISHED 1973

1000 Turley Law Center
6440 North Central Expressway
Dallas, Texas 75206

main 214-691-4025
toll-free 800-692-4025
fax 214-361-5802

turley@wturley.com
www.wturley.com

January 22, 2008

Mr. William Cremer
Cremer, Kopon, Shaughnessy & Spina, LLC
180 North LaSalle Street, Suite 3300
Chicago, IL 60601

Mr. Marcos Ronquillo
Godwin Pappas Ronquillo
1201 Elm Street, Suite 1700
Dallas, TX 75270

Re: Sacks, et al v. Four Seasons, et al

Dear Counsel:

As promised in my Notice to the Court yesterday, wherein Holly Sacks withdrew her privilege objection to the Hambright report, I am attaching all the documents we have relating to the Hambright investigation.

Please let me mention that until a few minutes ago the only document in our file was the main investigative report with a partial cover page.

I had never seen the addendum to the report or transmittal letter from Mr. Hambright. These items have come from Mr. Dunn's file.

The transmittal letter references photos. I know nothing of them but if they can be located they will be shared with you.



EXHIBIT
A

Messrs Cremer and Ronquillo
January 22, 2008
Page Two


I am also sending you the "partial" cover page which I referenced was in our file.


With kind regards,

Windle Turley

WT/bll
Attachments
cc: Winford Dunn



# FRIEDMAN & FEIGER, LLP
### ATTORNEYS AT LAW

5301 Spring Valley Road
Suite 200
Dallas, Texas 75240

Telephone (972) 788-1400
Telecopier (214) 346-4240

Date: September 10, 2003                    Client/Matter No.: 6638.02
From: Lawrence J. Friedman                  No. Of Pages (including cover) 14
Subject:     In Re Richard Sacks

| TO: | FAX No.: |
|-----|----------|
| Mr. Jeffrey Sacks | (972) 818-1498 |
| Mrs. Marilyn Proctor | (508) 653-3557 |

MESSAGE:  Please see the attached Investigator's Report.

### CONFIDENTIALITY NOTE

The information contained in this facsimile transmission is confidential information intended solely for the individual or entity indicated above and may be privileged attorney-client communication. If the reader is not the intended recipient, or an employee or agent of the named recipient, you are hereby notified that any dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient of this communication, please call the sender immediately and mail the communication to the sender at the address set forth above.

**Please call us immediately at (972) 788-1400 if the facsimile you receive is incomplete or illegible.**

3013 Colony Dr.
Mesquite, Texas 75150
(214) 335-9583
Hambright@aol.com

# HAMBRIGHT CONSULTING

Date: 6 September 2003

Investigative Subject:  **Death of Richard Sacks; Puerto Vallarta Investigative Activities**

## INVESTIGATIVE SUMMARY

### Café de Artistes

The Café de Artistes is regarded as a very upscale establishment in Puerto Vallarta, and located in a predominantly residential neighborhood, approximately three blocks up (east) from the *Malecon*, which is a primary tourist traffic area in Puerto Vallarta.

Directly across from the restaurant, there are two upscale galleries. One, across the street to the west of the restaurant entrance, is the *Galeria Café de Artistes Botique*. On the opposing corner, to the southeast of the restaurant entrance, is the *Galeria Omar Alonso*.

A general recon surveillance was made in the area surrounding the *Café de Artistes* prior to making any personal contact with restaurant personnel. Surveillance is conducted initially in order to get a feel for activity in the area, as well as making more casual contact with individuals working and moving about in the vicinity in order to gauge the validity of comments made by restaurant personnel when ultimately questioned about activity in the area. As a historical rule of thumb, if potential witnesses are prone to be untruthful when questioned, they will start by being untruthful about even minor details during initial questioning.

First contact was made in the area on Saturday afternoon, 3 August 2003. The location was visited at approximately 8:00 pm, then revisited at around 10:30 pm. Both times, contact was made with drivers waiting for patrons in the restaurant, as well as persons living within the area ( within a 300' radius). Additionally, contact was made with Puerto Vallarta police officers patrolling in the vicinity.

*September 7, 2003*
*Page 2*

On Sunday evening, 4 August 2003, at approximately 6:30 pm, contact was made with restaurant employees, as well as additional contacts with other persons in the vicinity.

The results of these contacts were as follows:

- The doorman to the restaurant was identified as Oscar. Oscar stated that he was not aware of the death of Mr. Sacks, and had not been previously questioned by any persons regarding this unfortunate occurrence. He did confirm that he was working on the night of June 7, 2003, but when shown the photo of Mr. Sacks, stated that he did not recall seeing him. He further stated that there are, *"many American tourists that come to the Café de Artistes, and he did not remember all of their faces".*

When Oscar was asked about drugs being dealt in the area, he was very quick to state that, *"that does not happen in this area…not here by the restaurant. There are many wealthy people who come here and the police watch very closely".* However, he did confirm that drugs could be purchased within one block in either direction from the restaurant, but not within the immediate vicinity, and certainly not within view of the front of the restaurant. He stated that it was no secret that drugs were readily available in Puerto Vallarta, but they (the police) keep the area around the restaurant *"clean".*

Oscar stated that he did not have any involvement with taking reservations for patrons of the restaurant, and referred me to management.

- I then visited with Sergio, who identified himself as the assistant manager of the restaurant. When asked who the manager was, he replied that it was the chef, but he only handled matters in the kitchen, and he (Sergio) could provide me with more of the information I was interested in.

As with Oscar, when shown the photo of Mr. Sacks, Sergio stated that he did not specifically recall him either. He said he did not believe he was a regular patron of the restaurant, or he might remember him. Otherwise, it was difficult to say with any certainty.

Sergio agreed to let me examine the restaurant reservation registry for the evening of Saturday, June 7th, 2003. There was a reservation noted for Richard and Holly Sacks, and the detail indicated that Bianca from the Four Seasons Resort had made the reservation for the couple, with an arrival time of 8:30 pm. There was no indication of exactly what time the Sacks' arrived, but it was a rather full evening of reservations, and Sergio commented that as long as they were there within forty-five minutes of their reserved time, there would be no

09/16/03   17:07 FAX 9727862667          FRIEDMAN FEIGER                    ☑004/014

September 7, 2003
Page 3

change in the reservation log. Additionally, there was no notation as to what time they left the restaurant. That is not information the restaurant keeps track of.

As was the case with Oscar, Sergio was adamant that there was no drug dealing done in the immediate vicinity of the restaurant, further stating that if he personally witnessed, or even heard rumor of such activity, he would contact the Puerto Vallarta police, stating activity of that nature was, *"bad for our business"*. Sergio said he understood that some of their patrons might use some of the drugs that were known to be readily available in Puerto Vallarta, and that, *"sometimes tourists think that is the thing to do here"*, but it was not something done out in the open in the area of the *Café de Artistes*.

Interestingly, there were close to a dozen drivers (both Taxi private car service drivers) that I questioned over a two day period in the area of the restaurant, and of that number, more than half knew of the driver from the Four Seasons named Glass. Additionally, most were aware that he was a former Puerto Vallarta police officer, and several stated that, *"if anyone knew were to buy drugs, he would...but that would be true of most Puerto Vallarta police officers...they know where the drugs are"*. Of note, however, not one of the persons contacted about Mr. Glass wanted to be identified as having given information about him.

No one contacted in the area had ever heard of a drug dealer going by the name of Arturo Jimenez, or of a local supplier referred to as *El David*. Of note, here were more inquiries made in Puerto Vallarta regarding the existence of these individuals, and those contacts will be expanded upon later in this report.

Although there was some indication that employees by the names of Ricardo and Jose might have information regarding this matter, a roster of employees of the *Café de Artistes* was reviewed, and for a six month period, there were no employees by either of those names.

## Funeraria Celis

*Funeraria Celis* is the funeral home where Mr. Sacks' body was prepared, and where arrangements were made to have him flown back to the U.S. This location was contacted early in the investigation, following an investigative plan wherein we were working more from *the back, forward*, gathering information that could be utilized to discover any false information or statements of misdirection that might be made by more questionable witnesses.

*September 7, 2003*
*Page 4*

The director of *Funeraria Celis* is Lic. Fernando I. Perez C., who is also a
licensed attorney in Mexico. After a little *prompting*, and convincing Mr. Perez
that I was authorized to receive the information, he was very forthcoming with
file documentation.

Mr. Perez explained that his establishment had a set-fee agreement with the U.S.
Consulate that was put in place to protect American citizens from price gouging
during such stressful times. Accordingly, whenever funeral home services were
needed through the Consulate, *Funeraria Celis* was the service provider
contacted.

When questioned about the seemingly quick time that Mr. Sacks' body was
prepared and shipped, Mr. Perez stated that in Puerto Vallarta, *"as soon as we
receive the proper paperwork from the Consulate, we act immediately...the same
day...there is no need to delay once the paperwork is provided from the
Consulate"*. Subsequently, Mr. Perez allowed me to review Mr. Sacks' file,
showing me that all the authorization from the Consulate had been provided, and
consequently, Mr. Sacks was, *"prepared immediately"*.

Mr. Perez further explained that it was not that it was not permitted for a body to
be transported on the same plane as a family member, but that American Airlines
did not have authorization to transport bodies from Puerto Vallarta. The only
airline with those provisions that flew to the Houston/Dallas airports, was
Continental Airlines. Mr. Perez stated that he worked quite often with
Continental, and in this case, they were the preferred provider for such services.

As is the case with many politically arranged service providers, Mr. Perez was
proud to show me photos of he and the Counsel General, along with several
ranking Mexican political figures, posing on the deck of a naval ship. He
indicated that this was how he kept his service contract in place.

**Puerto Vallarta Police**

One of the contacts I took advantage of while in Puerto Vallarta, is the brother-
in-law of the Director of Federal Police in that district. Although it was not
possible to secure copies of some records reviewed, it did allow access to, and
review of many documents that would not otherwise be readily available, short
of a civil order.

September 7, 2003
Page 5

Since the *Federales* see themselves as a step quite above local law enforcement,
they were not hesitant to confirm that the Puerto Vallarta police officers were
well known to have connections in the drug trade. Additionally, they stated that
it is seldom that a Puerto Vallarta police officer quits their jobs, however, it is
not uncommon for one to be fired from the department for not passing random
drug tests, which are regularly administered.

Of particular note, it was found out that the driver in question, Mr. Glass, was in
fact a former Puerto Vallarta police officer, and he was relieved of his duties
with the department within the last year due to failure to pass a drug screening
test. Interestingly, this is not necessarily seen as a shameful occurrence in the
area, but more of an act of stupidity *for getting caught*. Police officers make
approximately $150 per week, and have a decent pension, so these are not jobs
that are easy to come by, and although it is reported that *side jobs* (such as
dabbling in drugs) pays more than their salary, the pensions are highly regarded.

Great assistance was provided during my investigation by the Federal Police.
They provided an officer to accompany me during several of my inquiries, for a
small fee, and even though it was understood that the officer would not conduct
any direct questioning, it did provide me with quicker access in many areas.

## Medic-Air

The personnel at Medic-Air were more than willing to provide as much
information as possible regarding our investigation. They seem to generally feel
that since they did not admit Mr. Sacks as a patient, they would have no liability
regarding any standard of care issues.

One of the doctors on staff the day Mr. Sacks was brought to the facility, Dr.
Michael Daniel White, no longer works for Medic-Air. It was stated that he was
let go from the facility approximately one month ago, *"due to a lack of detail in
administrative tasks"*. Doctors and nurses at Medic-Air were continuously
questioned regarding Dr. White, and all were adamant that he was a *good doctor*,
but terrible at the administration duties required by the facility.

Prior to my leaving Puerto Vallarta, I did meet and interview Dr. White, and he
confirmed all prior information I had secured at Medic-Air.

Dr. Aldo Seimandi was the staff doctor in charge on the day I visited Medic-Air,
and he was also on duty the day Mr. Sacks was brought to the facility.

*September 7, 2003*
*Page 6*

Dr. Seimandi checked what hospital records were available to verify what he recalled as the facts from that day, then related that they did not check Mr. Sacks in as a patient that day. He stated that when the ambulance arrived, the attending doctor from the hotel (Dr. Barajas) stated that Mr. Sacks had already passed away. A doctor from Medic-Air went to the ambulance and confirmed the pronouncement, so the decision was made that it was not necessary to admit him as a patient. At that time, Mr. Sacks was brought into the emergency room to wait for the funeral home vehicle to arrive. He stated that Mrs. Sacks was allowed to wait in the emergency room with Mr. Sacks. He further confirmed that no treatment was considered, or offered, since they had accepted the pronouncement that Mr. Sacks had passed away during transport. He recalled that the hotel van arrived shortly after the ambulance, and that a representative from the hotel made the call to summon he funeral home vehicle. He further recalled that it was approximately two hours before the funeral home vehicle arrived.

Dr. Seimandi said that it was not uncommon for mid-highway transfers to be made from hotel vehicles to an ambulance. Because of the distance from the hotel to the clinic, often times. the doctor makes the call to begin transport in the hotel vehicle. However, Dr. Seimandi stated that he would not make such a call. He stated that he believed it was in the better interest of the patient to continue to attempt resuscitative measures at the hotel until the ambulance arrived, and that even if the patient died, he believed he would have a better chance to revive him at the hotel, instead of traveling in an *unprepared* vehicle.

Dr. Seimandi would not come out and say that he criticized the decision of Dr. Barajas, but continued to say that he would not have made that same choice.

Dr. Seimandi also confirmed that it was not one of the Air Medic ambulances that responded that day. There ambulance was on another call, so another ambulance provider sent service to the hotel.

Dr. Seimandi also added that he believed that on most occasions, the hotel would prefer to have a mid-highway transfer of a patient instead of having an ambulance on their premises. Even though it *is* not prohibited for an ambulance to make a pick up at the premises, he believes that hotel management sees that as *poor advertisement* for the resort.

Dr. Seimandi was not overly critical of the medical staff provided to the hotel, stating that many of the hotels did not have full time doctors available, and the Four Seasons being the type of resort that it is, he believes they have better

09/10/03   17:08 FAX 9727882867          FRIEDMAN FEIGER                          ☑008/014

medical care than most in the area. However, it is certainly not a , "*fully equipped clinic, prepared to handle emergencies*".

Of note, all of the personnel at the Medic-Air facility concurred with the statements made by Dr. Seimandi. On staff the day of my visit, there were two doctors, one receptionist/nurses aid, and two nurses.

From a personal observation, I did not believe the Air-Medic facility was in poor condition. From my experience in working in Latin America, this was one of the cleaner facilities I have seen. Although it was certainly not up to U.S. standards, for the area, it was in more than reasonable condition.

The ambulance driver was also located and questioned. Mr. Clemente Carrillo stated that he recalled the incident involving Mr. Sacks. His recollection was that when Mr. Sacks was transferred to his ambulance, he was still alive, however, between the point where the transfer was made, and the Air-Medic clinic, Mr. Sacks passed away. In accordance with the statements made by the staff at Air-Medic, Mr. Carrillo remembered that one of the doctors from the clinic came out and checked Mr. Sacks, confirmed that he had passed away, and offered no treatment at the facility. He recalled that Mr. Sacks was taken into the emergency room to wait for the funeral home transport.

## Servicios Medico De La Bahia

My visit to *Servicios Medico De La Bahia* was made after I had already managed to secure a copy of what is reported to be the call sheet from Dr. Barajas on the day of the incident. Considerable effort was made to secure this documentation first, not only to be certain that they did not prepare something contradictory after my visit, but also to see if they were willing to share the same information with me when confronted, and be more truthful in their responses to my questions. At no time during my visit was any person at *Servicios Medico De La Bahia* made aware that I already had the documentation in my possession.

Dr. Jose Luis Romo is the director of this medical service. Additionally, his wife is the office manager.

Initially, Dr. Romo stated that although he recalled Mr. Sacks' case very well, he also recalled that there was no documentation from that day. In fact, he stated

09/10/03  17:08 FAX 9727442687          FRIEDMAN FEIGER                    ☑ 009/014

*September 7, 2003*
*Page 8*

that they would check the files at the hotel, but he did not believe anything was memorialized in writing. Not surprisingly, after he was informed that I would go to the hotel with my *Federale* escort, who was waiting in the car (he could see from the front door), he then said he would check and see if he could find any notes. A short time later, Dr. Romo returned with the document I had previously secured a copy of. Of note, the document was an exact copy...no additional details had been added or deleted.

Dr. Romo stated that he believed Dr. Barajas administered proper care during this incident, and that there was nothing else he could have done. He is standing behind the position that Dr. Barajas recommended that Mr. Sacks go to the Medic-Air clinic for further examination upon his first visit to the room, and that

Mr. Sacks declined that recommendation. Dr. Romo stated that unless the patient was unconscious, they could not force him to go for further testing.

Dr. Romo also stated that he had been advised that hotel security had logged a bag of marijuana into the security record, stating that they found it on the hotel dresser after Mr. Sacks had been taken from the room.

Dr. Barajas was not available in person on the day of my visit, reportedly being on vacation for approximately three more weeks, in Guadalajara. However, I did speak to Dr. Barajas on the telephone, and he relayed the same information as Dr. Romo had, being adamant that he had tried to get Mr. Sacks to go to the clinic for further examination, and that Mr. Sacks refused. He further explained that he did not believe Mr. Sacks was being at all cooperative, was being belligerent in response to his questions, and stated that he knew what he was doing and did not want to go to the clinic.

Dr. Barajas stated that, *"I did everything I could to save Mr. Sacks at the hotel, and on the way to the hospital...he died in route to the hospital...there was nothing else we could do"*.

Both the documentation secured, and Dr. Barajas, confirm that a prescription was written to Mr. Sacks for valium. However, the prescription was never filled.

Of note, I did visit with management at the Marriott Casa Magna resort in Puerto Vallarta. They are also a client of *Servicios Medico De La Bahia*, and have been so for several years. They are extremely pleased with the services the doctors provide, and are confident in their skills. However, this hotel is less than ten minut·s from the main hospital facility of the service, which would certainly not put them in the category of a resort in an area as remote as the Four Seasons.

September 7, 2003
Page 9

### United States Consulate

The U.S. Consulate office in Puerto Vallarta was visited, and the Consular Agent (Kelly Trainor) that had assisted Mrs. Sacks was more than willing to visit with me.

Ms. Trainor stated that she recalled her dealings with Mrs. Sacks very well. She said the she remembered that the family did not want to have the body embalmed, and she spent some time on the telephone with the family Rabbi. Ms. Trainor said she explained that the health requirements were that embalming was

necessary, but that she would ask that the minimum level of embalming required to pass the health code would be done, and that she believed this offered some comfort to the family.

Ms. Trainor recalled that Mrs. Sacks, *"was in shock, as is often the case in these matters"*, and that she had to, *"keep repeating things to her to bring her back to the matters at hand".*

Ms. Trainor said that she handled, on the average, about one death of an American citizen per week, and that this case did not seem any more unusual than any others. She said she processed the paperwork immediately so that the body could be prepared and shipped back to the family in the U.S. She said that generally, it is not unusual to have this completed in one day. She confirmed the relationship as it had previously been described to me, with *Funeraria Celis.*

Ms. Trainor said she had considerable knowledge regarding the services of *Servicio Medico De La Bahia,* and held them in a somewhat high regard, relative to the services available in Mexico.

### Four Seasons Resort

Van Service: It was reported that the Four Seasons utilizes two classes of van service. That known as the *green vans,* and those known as the *blue vans.*

September 7, 2003
Page 10

The green vans are utilized to shuttle resort patrons within the confines of the considerable hotel grounds, and those vans do not leave the confines of the Four Seasons resort. These vans are owned by the resort, and driven by resort employees.

The blue vans are used to shuttle resort patrons to points outside of the resort perimeter. Service to Puerto Vallarta runs from $80 to $100. These vans are not owned by the hotel, and both the vans and drivers are provided as a concession service. This service is bid on, with the successful provider placing vans and drivers on the premises, to be readily available for resort patrons wishing to go into any of the surrounding towns.

Of note:  The Four Seasons resort is located in the state of Nayarit. Puerto Vallarta is located in the state of Jalisco. Licensing and registration requirements are different in both of these states.

It is reported that the Four Seasons resort has not direct involvement in the screening of, or hiring of drivers for the blue van concession service.

It is also reported that it is extremely difficult to get hired at the Four Seasons resort. Requirements for employment are more strict than any other surrounding resort, and consequently, once employed by the resort, employees receive many more benefits than at other resorts. Additionally, the Four Seasons is reported to not allow relatives to work at the resort.

Obviously, these same strict hiring standards are not observed by the concession van services permitted to operate on the premises.

The owner of the blue van concession service is Francisco Salazar. Mr. Salazar is reported to own the vans individually, and is not believed to have any corporation or other holding company. Inquiries to authorities at the airport in Puerto Vallarta, where Mr. Salazar previously applied for permission to operate his vans on the airport property, confirmed this information. Of note, Mr. Salazar's application for operating on airport grounds was denied. At this time, the reason for denial is not known.

It was confirmed that Mr. Glass is indeed a driver for this concession service, and on two visits to the resort property, it was confirmed that Mr. Glass was on duty, and was off the property with resort patrons.

09/10/03  17:08 FAX 9727842667          FRIEDMAN FEIGER                    ☑012-014

*September 7, 2003*
*Page 11*

While investigating in the area of the Four Seasons Resort, I was able to get a look at the resort security log. I was not able to secure a copy of the log, but for a fee, I was permitted to review the entries for the days in question. Of note, there is a security log entry, indicating that there was a bag of marijuana found in the room of Mr. & Mrs. Sacks, after Mr. Sacks had been taken to the hospital. The bag of marijuana was not removed, but noted, and the entry was signed by the director of security and one additional hotel employee as confirmation.

I was also permitted to look at the spa schedule for the resort, and confirm that the spa appointments for Richard and Holly Sacks were for 3:00 pm on the day in question.

Comments made by hotel employees indicated that there was a notation that Mrs. Sacks had been advised that the doctor had examined Richard while she was in the spa, and that she was told that, *he (Richard) said he was o.k.*, and not that the doctor said that he was o.k. *I*(Note: At this point, it is probable that where possible, the hotel has 'gotten its story together'; such as what employees were told happened. This is why it was important to see any documentation available to be prepared for what the hotel might use for defense against any claims made.)

Hotel employees also confirmed that Richard Sacks was taken from *the* hotel, strapped to a body board.

**General Contacts and Information:**

Of particular note, Mr. Glass, the driver in question, was located while in Puerto Vallarta. After several days of trying to locate him, and offering a small *fee* to

anyone who would advise me of his presence, he was contacted while parked two streets above the *Malecon*. As is his customary operation, he had brought patrons of the resort to Puerto Vallarta, dropped them off, and was waiting for their return.

*September 7, 2003*
*Page 11*

While investigating in the area of the Four Seasons Resort, I was able to get a look at the resort security log. I was not able to secure a copy of the log, but for a fee, I was permitted to review the entries for the days in question. Of note, there is a security log entry, indicating that there was a bag of marijuana found in the room of Mr. & Mrs. Sacks, after Mr. Sacks had been taken to the hospital. The bag of marijuana was not removed, but noted, and the entry was signed by the director of security and one additional hotel employee as confirmation.

I was also permitted to look at the spa schedule for the resort, and confirm that the spa appointments for Richard and Holly Sacks were for 3:00 pm on the day in question.

Comments made by hotel employees indicated that there was a notation that Mrs. Sacks had been advised that the doctor had examined Richard while she was in the spa, and that she was told that, *he (Richard) said he was o.k*, and not that the doctor said that he was o.k. [(Note: At this point, it is probable that where possible, the hotel has 'gotten its story together'; such as what employees were told happened. This is why it was important to see any documentation available to be prepared for what the hotel might use for defense against any claims made.)

Hotel employees also confirmed that Richard Sacks was taken from the hotel, strapped to a body board.

### General Contacts and Information:

Of particular note, Mr. Glass, the driver in question, was located while in Puerto Vallarta. After several days of trying to locate him, and offering a small *fee* to

anyone who would advise me of his presence, he was contacted while parked two streets above the *Malecon*. As is his customary operation, he had brought patrons of the resort to Puerto Vallarta, dropped them off, and was waiting for their return.

September 7, 2003
Page 12

Mr. Glass was very defensive at being questioned, and intimated that some threat might come as the result of trying to involve him in this situation. However, after quite some time, he began to get somewhat arrogant, and even stated that he had in fact provided the marijuana to the Sacks. After I convinced him that I was aware that such drugs were readily available, and insinuated that I was not interested in his involvement, but more looking to what Richard and Holly did during that evening, he actually became arrogant and bragged about knowing how to, *"get what all the tourists want"*. He did not admit to helping secure anything other than marijuana, and when questioned about his history with the Puerto Vallarta police department, he insisted that he, *"quit that job because he makes more money driving the van"*. I did not think it would be profitable to the investigation to let him know I was aware that he was fired from the police department.

Mr. Glass was not aware that I knew who owned the van service, and when questioned, he would not provide that information. He did state that he did not work for the resort, but for the van company.

To say the least, Mr. Glass's credibility is suspect, which for our purposes, might be an added benefit. It would probably be easier to line up witnesses to cast doubt on Mr. Glass, than it would to have Mr. Glass admit his wrongdoing in an, which for our purposes, might be an added benefit. It would probably be easier to line up witnesses to cast doubt on Mr. Glass, than it would to have Mr. Glass admit his wrongdoing in any formal civil proceeding.

Of note: The morning after my interview with Mr. Glass, someone tried to kick in my hotel door. Witnesses reported that there was one individual kicking in the door to my room, while one individual stood in the hallway, and another man held the elevator door open so nobody could come up the elevator. This could be a coincidence, however, any further inquiry regarding Mr. Glass should be made with appropriate caution.

### Additional Inquiries

Contact has been made with individuals in the Puerto Vallarta area, to confirm what kind of treatment equipment is available for doctors present at the Four Seasons resort. As soon as this information is made available, I will supplement this report.

*September 7, 2003*
*Page 13*

After you have had an opportunity to review this report at your convenience, should you have any questions, or wish to discuss any of this information in any further detail, please feel free to contact me at your convenience.

Sincerely,

Dennis W. Hambright, Investigator

**Café de Artistes**
**General Information**

**Café de Artistes**
**Guadalupe Sanchez # 740**
**Puerto Vallarta, Mexico**

**Assistant Manager: Sergio**

**Door Attendant:      Oscar**

- **Café de Artistes is located on Guadalupe Sanchez, three blocks east of the Malecon (Paseo Diaz O.).**

- **Café de Artistes is located adjacent to two art galleries:**

  - **Galeria Café de Artistes Botique, situated directly across the street from, and west of the Café entrance.**

  - **Galeria Omar Alonso, situated across the street, and to the southeast of the Café entrance.**

- **Café de Artistes is situated in a primarily residential neighborhood, and well known to be patronized by locals and tourists of considerable means. Consequently, there are regular police patrols in the area, and loitering by anyone other than restaurant patrons or waiting drivers is closely monitored.**

**Funeraria Celis**
**General Information**

**Funeraria Celis**
**San Salvador No. 253**
**Esq. Con Colombia**
**Puerto Vallarta, Mexico**
**Telephone:  (01322) 222-1671  222-0544**
**Fax:  (01322) 222-2109**

**Director:  Lic. Fernando I. Perez C.  (also an attorney)**

**Note:  Funeraria Celis has an agreement with the U.S. Consulate office in Puerto Vallarta, for providing services to U.S. citizens:**

- *Prices for services are provided on a set-fee schedule to prevent price gouging.*
- *Once the proper paperwork has been provided by the Consulate, services are immediately performed (no delay of services as is often the case in many foreign countries).*
- *No decisions are made on the part of Funeraria Celis regarding the type of services provided. They only respond to directives provided by the client or the Consulate.*
- *Funeraria Celis has a longstanding relationship with Continental Airlines for shipping bodies.  They state that American Airlines does not provide such services.*

**Medic-Air**
**General Information**

Medic-Air
Carr. Tepic-Puerto Vallarta # 67 Sur
Mezcales, Nay
Telephone: (329) 296-54-44
www.medicair.com.mx
E-mail: medicair@prodigy.net.mx

General Surgeon: Dr. Aldo F. Seimandi U.


Medic-Air also has two other locations within the region:

Medic-Air
Av. Mexico #993
Puerto Vallarta, Jal.
Telephone: (322) 222-15-96
Fax: (322) 222-16-00

Medic-Air
Federalismonte #469
Guadalajara, Ja.
Telephone: (33) 3825-2843
Fax: (33) 3825-1449


Note:  Dr. Aldo F. Seimandi U. states that he is a personal friend of, and has treated in the past, Mr. Tom Price, and attorney and former Judge in Texas.

Note:  Dr. Michael Daniel White was on staff the day Mr. Sacks was brought into the facility.  Dr. White is no longer employed by Medic-Air.  They report that Dr. White was let go from the facility due to a lack of detail in daily, administrative tasks.  Dr. White has been gone from the facility for approximately one month, and at this time, can be reached at: 01322-22-72781.

**Servicio Medico De La Bahia**
**General Information**

**Servicio Medico De La Bahia**
**Blvd. Francisco Medina Ascencio no. 500 C.P. 48330**
**Puerto Vallarta, Mexico**
**Telephone: (3) 222-26-27  222-51-52  223-16-00**
**Directing Physician:  Dr. Jose Luis Romo Razo**
**E-Mail:  smb@prodigy.net.mx**

**All physicians listed as being on staff at Servicion Medico De La Bahia:**

| | | | |
|---|---|---|---|
| a. | Dr. Jose Luis Romo Razo | No. 601910 | UAG |
| b. | Dr. Ricardo Alberto Barajas Fuentes | No. 3568324 | UAG |
| c. | Dro. Jorge Ruiz Orozco | No. 3346326 | UAG |
| d. | Dr. Luis Cabrera | No. 939299 | UDEG |
| e. | Dra. Monica Barajas | No. 3309157 | UAG |
| f. | Dr. Paul Castro | No. 3250388 | UAG |

- **UAG: Medical School; Universidad Autonoma de Guadalajara**

**Posted fees for services at main location:**

- **Hospital: $1,150 pesos**
- **Consultation: $500 pesos**

**Clinic is located directly across the street from the Sheraton Hotel in Puerto Vallarta.**

**I has been reported that the service provides doctors to approximately twelve (12) hotels in the Bay of Banderas area, and has done so for over seven years. (Reports are that the service has been in business longer, but I could only verify information for a seven year period.)**

**United States Consulate**
**General Information**

**United States Consulate, Puerto Vallarta**
**Zaragoza # 160, 2nd Floor**
**Puerto Vallarta, Jalisco**
**Mexico  48300**
**Telephone:  (322) 222-00-69**
**Fax:  (322) 223-00-74**
**Ms. Kelly Trainor, Consular Agent**
**Ms. C. Jacqueline Guerrero, Consular Assistant**

- **Consulate handles an average of one death of an American citizen per week.**

- **Consulate has an agreement with Funeraria Celis with a set-fee schedule to prevent price gouging of American citizens.**

- **If Consulate is not made aware of any suspected foul plan, paperwork can, and generally is processed within one day in order to expedite arrangements for the family.**

**Van Service at Punta Mita Four Seasons Resort**
**General Information**

**The Punta Mita Four Seasons Resort utilizes two classes of vans service:**

- Those referred to as the 'green vans', which are owned by the hotel, and used to shuttle patrons within the considerable hotel grounds.

- Those referred to as the 'blue vans', which are provided by a concession service that bids for the right to locate their vans adjacent to the entrance of the hotel. It has been reported that the hotel does not have any influence over who is hired to drive these vans; only that the van service tries to provide the best drivers possible in order not to lose their concession rights. These vans charge from $80 to $100 per trip to shuttle hotel patrons to and from Puerto Vallarta.

It is reported that at one time, the owner of the van concession service made application to the Puerto Vallarta Airport for the right to pick up and deliver passengers to the airport. Reports are that that application was denied, and at this time, they do not have the right to operate on airport property.

The owner of the van concession for the 'blue vans' is:

Francisco Salazar
Telephone:  01322-29-71079 or 01329-29-71079
(they were not sure if it was a Jalisco or Nayarit number)

3013 Colony Dr.
Mesquite, Texas 75150
(214) 335-9583
Hambright@aol.com

# HAMBRIGHT CONSULTING

*ADDENDUM A*
*To:*
*Confidential Investigative Report:*
*Death of Richard Sacks:*
*Investigative Activities*
*Conducted In*
*Puerto Vallarta, Mexico*
*Dated: 6 September 2003*

In addition to the information provided in the original report submitted 6 September 2003, and specifically concerning facts provided under *General Contacts and Information* on pages 11 and 12 of the report, there was information secured regarding the possible participation of Ms. Holly Sacks in securing narcotics during the time in question.

As has been rumored and previously indicated, the van driver (Mr. Glass) that transported Richard and Holly Sacks from the Punta Mita resort, to the Café de Artistes did indicate during my questioning that Ms. Holly Sacks did in fact provide money to him to purchase the drug known as exstacy (X). Mr. Glass denies that he actually *sold* the drug to the Sacks', but did in fact secure the services of a local dealer to provide the drug to them.

Surprisingly, even though Mr. Glass readily admits, and actually brags about being able to, and in fact provide marijuana to the Sacks', he does adamantly deny selling them 'X'.

As we have discussed, I was able, after some extensive effort, to secure 'X' myself in Puerto Vallarta, which did in fact bear the cartoon figure that was previously described. This particular product has been very difficult to come by in recent years, but with the right connections, is available.

*November 16, 2003*
*Page 2*

Again, considering what we do know about Mr. Glass, any testimony he provides would be somewhat suspect, but all factors considered, he would have little to gain by *making up* the information he has provided. Additionally, some of the subsequent contacts I had in the area after my contact with Mr. Glass tend to make me lend even more credibility to his comments.

As we have previously discussed, security reports at the Punta Mita Resort do indicate that marijuana was found in the room, however, there is no indication of any other drugs located.

Signed,

Dennis W. Hambright, Investigator



3013 Colony Dr.
Mesquite, Texas 75150
(214) 335-9583
Hambright@msl.com

# HAMBRIGHT CONSULTING

6 September 2003

Mr. Larry Friedman
Friedman & Feiger
Dallas, Texas

   Re: *Death of Richard Sacks: Puerto Vallarta Investigative Activities*

Dear Larry,

  Pursuant to our meetings, and upon instruction from Mr. Melvin Sacks, Ms. Marilyn Proctor (Sacks) and Ms. Holly Sacks, I have completed my recent inquiries in Puerto Vallarta, Mexico. As directed, my purpose was to secure additional information and documentation surrounding the activity and participation of any person or organization involved with Richard and Holly Sacks during their trip to the area in June 2003, and any related information pertaining to the death of Mr. Sacks.

  As we have briefly discussed since my return, there were a number of interesting facts brought to light during my investigation, as well as some new documentation that should prove relevant in preparing any future case regarding this matter.

  In addition to the written summary of my activity and findings, I am also including with my report, a number of photos of selected locations key to the history of this matter. I thought these photos might provide a better sense and feel of the activity that took place during the time in question.

  Since Ms. Holly Sacks has provided a general verbal summary of their trip, at least as far as the initial report is concerned, I will dispense with the necessity of repeating what would appear to be non-pertinent facts to the investigation, i.e. what time they left Dallas, how they traveled to the airport, what type of clothes they wore, etc. In fact, althought I believe there are areas where speculation might be made, the content of my investigative report will only relate the information that was secured by personal inspection of documents, personal interviews with parties involved, or any other verifiable evidence encountered. Any speculation or opinions on my part will be left for any future discussions that might be needed.

. . . . . . . . . . . . . . . . . . . . . . . . .

*November 16, 2003*
*Page 2*

After you have had time to review the enclosed information, please feel free to contact me at your convenience should you have any questions, or wish to discuss this matter in any further detail.

Sincerely,

Dennis W. Hambright, Investigator

3013 Colony Dr
Mesquite, Texas 75150
(214) 335-9583
Hambright@aol.com

# HAMBRIGHT CONSULTING

*FAX*
*# 972 - 243*
*9669*

16 November 2003

Ms. Marilyn Proctor
305 E. Winchester St.
Newton, Mass. 02461
(617) 969-6975

Re: *Investigation; Richard Sacks*  *972*
*818 - 1498*

Dear Marilyn,

As per your request, I am enclosing a copy of the investigative report I prepared subsequent to my trip to Puerto Vallarta, Mexico. In addition to the originally submitted report, I am including an *"Addendum A"* to the report which briefly addresses some of the *'drug issues'* we discussed, and agreed not to include into the body of the original report.

Please review these materials at your convenience, and if you would like to discuss the information in any further detail or have me provide any additional services, feel free to contact me at any time.

Thank you again for allowing me to work with you and your family on this matter.

Sincerely,

Dennis W. Hambright

Date: 6 September 2003

Investigative Subject: Death of Richard Sacks; Puerto Vallarta Investigative Activities

## INVESTIGATIVE SUMMARY

### Café de Artistes

The Café de Artistes is regarded as a very upscale establishment in Puerto Vallarta, and located in a predominantly residential neighborhood, approximately three blocks up (east) from the *Malecon*, which is a primary tourist traffic area in Puerto Vallarta.

Directly across from the restaurant, there are two upscale galleries. One, across the street to the west of the restaurant entrance, is the *Galeria Café de Artistes Botique*. On the opposing corner, to the southeast of the restaurant entrance, is the *Galeria Omar Alonso*.

A general recon surveillance was made in the area surrounding the *Café de Artistes* prior to making any personal contact with restaurant personnel. Surveillance is conducted initially in order to get a feel for activity in the area, as well as making more casual contact with individuals working and moving about in the vicinity in order to gauge the validity of comments made by restaurant personnel when ultimately questioned about activity in the area. As a historical rule of thumb, if potential witnesses are prone to be untruthful when questioned, they will start by being untruthful about even minor details during initial questioning.

First contact was made in the area on Saturday afternoon, 3 August 2003. The location was visited at approximately 8:00 pm, then revisited at around 10:30 pm. Both times, contact was made with drivers waiting for patrons in the restaurant, as well as persons living within the area (within a 300' radius). Additionally, contact was made with Puerto Vallarta police officers patrolling in the vicinity.