IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| 1. HOLLY ANN SACKS, Individually and and as Representative of the Estate of RICHARD TODD SACKS, 2. MELVIN PHILLIP SACKS, and 3. MARILYN PROCTOR, | § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 5-04-073 JURY |
| VS. | § § | |
| 1. FOUR SEASONS HOTELS LIMITED and 2. FOUR SEASONS PUNTA MITA, S.A. de C.V., | § § § § § | |
| Defendants. | § | |

**DEFENDANTS' SECOND MOTION FOR SANCTIONS FOR DISCOVERY ABUSE AGAINST PLAINTIFF MELVIN PHILLIP SACKS AND HIS COUNSEL**

COME NOW Four Seasons Hotels Limited and Four Seasons Punta Mita, S.A. de C.V., ("Four Seasons"), and file this Second Motion for Sanctions for Discovery Abuse Against Plaintiff Melvin Phillip Sacks and his Counsel and respectfully show the Court the following:

**I.    SUMMARY OF THE ARGUMENT**

1.    Four Seasons files this Second Motion for Sanctions complaining of the repeated and egregious abuse of the discovery process by Melvin Phillip Sacks who provided evasive, incomplete, and false responses to Four Seasons' discovery requests. Specifically, despite relevant discovery requests, Melvin Sacks failed to disclose that he was a defendants in a separate civil litigation wherein he, Holly Sacks as representative of the Estate of Richard Sacks, and Integrated Packing Solutions, ("IPS"), the business owned and/or operated by Richard Sacks from 2000-2003, were sued for fraud. IPS is the company upon which Plaintiffs' economist expert has based his damages calculation, on the major assumption that IPS was a cash cow that served as the basis for his calculation of Richard Sacks' lost future earning capacity. The expert

1

was never told of this lawsuit. Melvin Sacks' failure to disclose this information is not an isolated act. Rather, it is yet another example of impermissible discovery abuse utilized by Plaintiff in this litigation.

2. Furthermore, Four Seasons alleges that counsel for Melvin Sacks, Winford Dunn, was aware of the fraud lawsuit and he also failed to disclose this information to Four Seasons and to Melvin Sacks' damages expert, thereby causing the expert to render an unreliable inflated opinion. For his failure to disclose this information, Mr. Dunn should be sanctioned as well.

3. As the Court is aware, Four Seasons previously filed an Emergency Motion for New Scheduling Order and Trial Date and Motion for Sanctions ("Emergency Motion for Sanctions") on January 9, 2008 after discovering that Plaintiff had withheld disclosure of the Mission Investigations report and did not produce a privilege log. Dkt. 208. The report provided evidence that Holly Sacks and Richard Todd Sacks purchased ecstasy and Viagra the night before Richard Todd Sacks' sudden death in Mexico. This evidence is highly relevant to the wrongful death action asserted by Plaintiffs in this lawsuit.

4. On January 10, 2008, the Court set the Emergency Motion for Sanctions for hearing on January 23, 2008. Dkt. 211. Merely two days before the January 23 hearing, Holly Sacks filed a Notice of Withdrawal of Privilege Assertion as to yet another investigative report that she had withheld without producing a privilege log (i.e.) the Hambright Report.[1] Dkt. 227. That motion is pending before the court.

---

[1] On February 11, 2008, Four Seasons deposed Jeffrey Sacks. In response to questions about the Hambright Report, Jeffrey Sacks refused to answer, claiming that it was he who had the attorney-client privilege as to the Hambright Report and refused to abide by the Notice of Withdrawal of Privilege filed by Plaintiff Holly Sacks. This assertion by Jeffrey Sacks and his refusal to abide by the withdrawal of the privilege begs the non-rhetorical question: did Holly Sacks in fact have a privilege to begin with, and if she did, has the privilege now been waived so that Jeffrey Sacks no longer has a basis to assert the privilege? Or alternatively, if Jeffrey Sacks did have a privilege, but he gave the Hambright Report to Holly Sacks, has he waived the privilege? Four Seasons brings this to the attention of the court to show the sophistry being practiced by Plaintiffs.

5.      After further investigation following the January 23 hearing, in preparation for the deposition of Jeffrey Sacks, Four Seasons learned that Holly Sacks, Melvin Sacks, Jeffrey Sacks (brother of Richard Todd Sacks), and IPS (companies partly owned and/or operated by Richard Todd Sacks) were defendants in a lawsuit in the 160th District Court in Dallas County, Texas, Cause No. 06-12421, styled *Atrium Companies, Inc. v. Integrated Packaging, Inc.; Integrated Packaging Concepts, L.L.C.; Jeffrey M. Sacks; Melvin P. Sacks; et al.* (the "Atrium Lawsuit").[2] The Atrium lawsuit alleges a pattern of fraud between 2000-2006 against these defendants. Melvin Sacks did not disclose that he was a defendant to this litigation and never provided the cause number or style of the Atrium Lawsuit despite discovery requests seeking information about prior civil suits.

6.      Because of the pattern of continued abuse by Melvin Sacks in wholly failing to disclose, or providing evasive and incomplete and untruthful discovery responses regarding the Atrium Lawsuit – a matter detrimental to the damages element of his claims - Four Seasons therefore seeks dismissal of the claims asserted by Melvin Sacks.

## II.     BACKGROUND

7.      Plaintiffs Holly Ann Sacks, Marilyn Sacks Proctor, and Melvin Phillip Sacks (collectively, "Plaintiffs") seek in excess of $30 million in damages from Four Seasons resulting from the death of Richard Todd Sacks in June 2003 while staying at the Four Seasons Punta Mita Resort. Dkt. 1 at ¶5.2. This case is currently set for trial on April 8, 2008.

8.      On December 11, 2006, Atrium Companies, Inc. ("Atrium") filed its *Application for Appointment of Receiver, Writ of Attachment, Temporary Restraining Order, and Temporary*

---

[2] Four Seasons attaches Plaintiff's Application for Appointment of Receiver, Writ of Attachment, Temporary Restraining Order, and Temporary and Permanent Injunctions filed in the Atrium Lawsuit on December 11, 2006 as **Exhibit "A."** Four Seasons attaches Plaintiff's First Amended Petition filed in the Atrium Lawsuit on December 27, 2006 as **Exhibit "B."** Four Seasons attaches Form No. 353-3 Citation, for Cause No. DC-06-12421 to Melvin P. Sacks with attached Affidavit of Service demonstrating service on December 14, 2006 as **Exhibit "C."**

*and Permanent Injunctions*, ("TRO Application") in the Atrium Lawsuit. *See* **Exhibit "A."** Atrium requested appointment of a receiver over IPS to end fraudulent conduct perpetrated by IPS. *Id.* at 1.  Atrium alleged that IPS "defraud[ed] customers by intentionally shorting them on orders for packaging materials" and paid "monetary kickbacks" and "kickbacks in the form of marihuana [sic]" to its employees and individuals employed by the customers allegedly defrauded. *Id.* at 2.  The TRO Application alleges that IPS is nearly insolvent and owes the IRS more than $900,000 in back taxes.  The TRO Application attached the Affidavit D.D. Agostinelli, the Senior Vice President of Atrium, who in turn attached the Declarations of Thurman Taylor and Carla Wesson. *See* **Exhibits "D,[3]"** **"E,"** and **"F,"** respectively.  These affiants laid out in detail the fraudulent activity of Richard Sacks, Melvin Sacks and Jeffrey Sacks and their use of IPS to defraud their clients over a six year period.

9.   On December 14, 2006, Melvin Sacks was served with the Citation notifying him that he was being sued in the Atrium Lawsuit. *See* **Exhibit "C."**

10.   On December 27, 2006, Atrium filed its First Amended Petition asserting causes of action for fraud, breach of contract, conversion, common law conspiracy, claims under the Texas Theft Liability Act, and aiding and abetting. *See* **Exhibit "B."**  Atrium named Melvin Sacks as a defendant.  Atrium alleged that IPS, acting through the individual defendants, created a scheme to defraud IPS's customers and defrauded Atrium of $2.3 million by intentionally shorting orders for packaging materials and delivering fewer materials than the customer ordered and paid for. *Id.* at 6.  Atrium alleged that Jeffrey Sacks and Richard Sacks hid the scheme by "bribing Atrium employees…by directing that sizeable cash payments be made to them" and "recruit[ed] select employees of its customers to…turn a blind eye to the fact that [IPS] was not

---

[3]   Mr. Agostinelli identifies Felix Hicks as an Atrium employee who allegedly accepted bribes.  Mr. Hicks has denied the allegations and the matter as to him was settled in February 2007.  Godwin Pappas Ronquillo LLP represented Mr. Hicks.

delivering such customers all of the packaging materials they paid for and expected," or that they provided marijuana as a bribe. *Id.* at 2,6. Atrium alleged that Melvin Sacks knew of the scheme and "supervised, directed and participated in the shorting process and the payment of kickbacks to individuals." *Id.* at 6-7. Atrium alleged that prior to his death, Richard Sacks "participated in and orchestrated the fraudulent scheme along with his brother[.]" *Id.* Atrium alleged that after Richard Sacks' death, Jeffrey Sacks continued the fraudulent scheme along with Melvin Sacks.

11. Atrium further alleged that "[a]s a result of Richard Sacks' orchestration and involvement in the fraudulent scheme, the value of [IPS] was greatly inflated during the administration of his estate," and demanded that Holly Sacks, as beneficiary of the Estate of Richard Sacks, be held responsible for repaying Richard Sacks' debts to Atrium Companies, Inc. due to her receipt of approximately $900,000 from Richard Sacks' portion of IPS. *Id.*

12. As quickly as the Atrium Lawsuit was filed in December 2006, it was just as quickly settled in January 2007, which is indicative of the overwhelming evidence amassed against these fraudulent defendants.

13. On January 29, 2007, the court entered an Interlocutory Agreed Judgment. *See* **Exhibit "G."** IPS, Jeffrey Sacks and Atrium settled all claims and "agreed that judgment should be rendered in favor of Atrium" on each cause of action alleged in Plaintiff's First Amended Petition. *Id.* The Interlocutory Agreed Judgment ordered that Atrium recover $2,500,000.00, post-judgment interest, attorneys' fees and costs from IPS and Jeffrey Sacks. *Id.* at 2. Atrium filed UCC liens in the amount of $2.0 million to secure the judgment against IPS. IPS/Jeffrey Sacks paid $500,000 upfront as part of the settlement.[4]

---

[4] In the documents obtained during discovery, Defendant Four Seasons obtained the records of Neill Ravella, the psychologist for Melvin Sacks. The psychologist's notes indicate his sessions with Melvin Sacks, and reveal that Melvin Sacks was well aware of IPS' and Jeffrey Sacks' settlement with Atrium. Ravella's entry for January 19, 2007, has a notation: "raising $500,000 for Jeffrey." A week later, the notation reads: $20,000 away from paying debt." This timeframe is the same as when the Interlocutory Agreed Judgment was entered on January 29.

5

14.     On February 9, 2007, Atrium filed an Unopposed Motion for Dismissal With Prejudice stating that Atrium had resolved its claims against Melvin Sacks. *See* **Exhibit "H."** When he was deposed on October 11, 2007, Melvin Sacks failed to disclose the Atrium Lawsuit.[5] On May 30, 2007, the court in the Atrium Lawsuit entered an Agreed Order of Dismissal With Prejudice dismissing the claims against Melvin Sacks in the Atrium Lawsuit. *See* **Exhibit "I."**

15.     Despite the significance and relevance of the Atrium Lawsuit to the calculation of Plaintiffs' damages in the present litigation, Plaintiff Melvin Sacks has given evasive, incomplete and untruthful answers to discovery requests related to the Atrium Lawsuit. Defendants request the Court to enter appropriate sanctions against Melvin Sacks, up to and including dismissal of his meritless lawsuit, and his counsel for his role in not disclosing this information.

### III.    ARGUMENT AND AUTHORITIES

####    A.    Discovery Requirements Under the Federal Rules of Civil Procedure

16.     Parties have a duty to supplement their disclosures, including prior responses to written discovery requests under Rule 26(e). FED. R. CIV. P. 26(e); *see also ClearValue, Inc. v. Pearl River Polymers, Inc.*, 242 F.R.D. 362, 373 (E.D. Tex. 2007). The failure of a party to amend a prior response to discovery as required by Rule 26(e)(2) triggers the court's power to impose discovery sanctions under Rule 37(c), "including attorney's fees, caused by the failure," "informing the jury of the failure to make the disclosure" and other "actions authorized under Rule 37(b)(2)(A), (B), and (C)[.]" FED. R. CIV. P. 37(c); *Clear Value*, 242 F.R.D. at 373-74.

---

[5]     In fact, when he was asked at his deposition about a "fraudulent pricing scheme" at IPS, Melvin Sacks was instructed by his counsel, Winford Dunn, to not answer because, allegedly, there was a confidentiality agreement. To date, Melvin Sacks has failed to produce the alleged confidentiality agreement that applies to him. Defendants did uncover an Agreed Protective Order that was entered in the Atrium Lawsuit between Atrium, IPS and Jeffrey Sacks. It does not apply to Melvin Sacks; he is <u>not</u> a party to the confidentiality agreement. Hence, Melvin Sacks' claim of confidentiality and the objection from his counsel are without merit and were intentionally asserted to prevent Defendants from discovering his role in the fraud perpetrated by him and his sons.

6

17.  The sanctions authorized include "an order striking out pleadings or parts thereof, dismissing an action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party."  FED. R. CIV. P. 37(b)(2)(C).  A court should apply sanctions "diligently" in order "to penalize those whose conduct may be deemed to warrant such a sanction" and as a means "to deter those who might be tempted to [engage in] such conduct in the absence of such a deterrent."  *Nat. Hockey League v. Metro. Hockey Club*, 427 U.S. 639 (1976).  Further, the court has the inherent power to sanction conduct that is not effectively sanctionable pursuant to an existing rule or statute.  *Tobias v. Davidson Plywood*, 241 F.R.D. 590, 592 (E.D. Tex. 2007).

18.  In determining whether striking a pleading is an appropriate sanction the court must consider (1) the egregiousness, willfulness or bad faith by a party, and (2) whether a lesser sanction would appropriately deter such conduct.  *United States v. $49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003).  A court may consider factors such as the prejudice on the opposing party's preparation for trial and "whether the client was blameless in the violation." *Id.*

### B. The Failure to Disclose the Atrium Lawsuit and Its Impact on the Damages Calculation by Plaintiffs' Expert Perpetrates a Fraud on the Defendants

19.  Plaintiffs assert in excess of $30 million in damages.  Plaintiff Holly Sacks designated Dr. Thomas H. Mayor as an expert "to testify as to the economic damages suffered by Holly Sacks in the past and in the future as a result of the wrongful death of Richard Sacks." *See* **Exhibit "J,"** and **Exhibit "K."**  Dr. Mayor was deposed on December 14, 2007 and opines on the "present cash value of lost earning capacity" due to Richard Sacks' death. *See* **Exhibit "K,"** at 2.  Dr. Mayor's analysis centers around Mr. Sacks' income as an alleged 50% owner of IPS.

20. Dr. Mayor relied on Richard Sacks' after-tax earnings from a "draft" 2002 income tax return to opine that Richard Sacks' after-tax earnings from IPS in 2002 were $656,177.[6] *Id* Dr. Mayor noted that IPS' business had been growing rapidly and analyzed corporate sales from 2000, 2001, and 2002 and opined that "[g]iven this track record" it was "reasonable to assess Mr. Sacks' earnings potential on the latest full-year data available, namely 2002 data, rather than on earlier data."[7] *Id.* at 3. Dr. Mayor presciently opined that "but for his death, [Richard] Sacks would have continued to operate his business at about the same level he demonstrated in 2002." *Id.* Based on a single year of data for the year 2002, Dr. Mayor opined on the net income Richard Sacks would have obtained for each year from 2003-2031 to find a mid-point range of total lost future earnings of $19,305,377.31.

21. Dr. Mayor further stated that his assumptions were "inconsistent with [Richard] Sacks' past ability to grow [IPS] at exceptionally high rates." *Id.* at 3. Dr. Mayor noted that IPS "gross (and net) revenues had been growing at a rate in excess of 50% per year." *Id.* As such, Dr. Mayor opined that Richard Sacks' earnings could have "greatly exceeded" his projection of a mid-point range of $19,305,377 shown in Table 1 of his report. *Id.* at 4.

22. Dr. Mayor's report, however, was silent on the Atrium Lawsuit, and any allegations that IPS, Richard Sacks, Jeffrey Sacks and Melvin Sacks had defrauded Atrium out of $2.3 million while Richard Sacks was part owner and operator of IPS. At his deposition, Jeffrey Sacks asserted his 5th Amendment privilege over 100 times when asked about his ownership/involvement with IPS. Dr. Mayor also was kept in the dark about the fact that IPS had just settled with Atrium for $2.5 million because of the fraud. None of this adverse information was factored into Dr. Mayor's damages calculation. In fact, no information related to the Atrium Lawsuit or IPS' fraudulent pricing scheme and inflated revenues are listed in the

---

[6] The draft 2002 income tax return is unsigned and stamped: "Discussion Draft Not For Distribution."
[7] The 2000-2002 time period is the same period that IPS was defrauding Atrium and other vendors.

documents reviewed and/or relied upon by Dr. Mayor. In substantial part, the opinions of Dr. Mayor were based upon "draft", unsigned tax statements from 2000-2002 that Dr. Mayor testified he had no way of knowing whether these were actually filed with the IRS. *See* **Exhibit "L,"** at 80:17-83:1.

23.     Moreover, Dr. Mayor was unaware of UCC liens or the federal tax liens levied against Richard Sacks and IPS (or Jeffrey Sacks) or the underlying circumstances supporting those liens. *Id.* at 125:23-130:1. Dr. Mayor testified that he would "need more information" regarding potential embezzlement at IPS and the use of IPS money for personal affairs in order to factor such information into or alter his opinions. *Id.* at 143:9-147:7; 151:17-152:10. It is clear that the information regarding the Atrium Lawsuit would have impacted his calculations, but Dr. Mayor was kept in the dark about the Atrium litigation and the fraudulent pricing scheme of IPS.

24.     Dr. Mayor also was designated as a damages expert by Melvin Sacks. *See* **Exhibit "M."** The Mayor Report and Mayor's deposition transcript have been provided to Melvin Sacks and his counsel. Melvin Sacks indisputably knew of the Atrium Lawsuit since he was a defendant. His counsel, Winford Dunn, knew of the Atrium Lawsuit as evidenced by his objections at the deposition of Melvin Sacks. *See infra* at ¶28, pages 10-12. Yet to date, neither Melvin Sacks nor his counsel have supplemented or amended the discovery answers.

25.     Melvin Sacks intends to present Dr. Mayor before this Court and jury to support Richard Sacks' alleged lost future income through IPS projected to be in excess of $17 million – as the base range – without ever disclosing the specious basis for such damage calculation or the fact that the Atrium litigation and potential criminal accusations regarding this income was ongoing. This type of half-truth promoted by Plaintiff perpetrates a fraud on the Four Seasons, causes extreme prejudice to Four Seasons, and must be appropriately sanctioned.

9

### C. Melvin Sacks' Discovery Abuse Warrants Sanctions

26. On July 25, 2007, Four Seasons served their First Requests for Production to Plaintiff Melvin Sacks. Request for Production No. 37 to Melvin Sacks, requested "[a]ll petitions and/or counterclaims you filed or that were filed against you." On August 27, 2007, Melvin Sacks gave an evasive response to Request for Production No. 37 and stated: "None in the possession of this Plaintiff." *See* **Exhibit "N,"** at 7.

27. Four Seasons served their First Requests for Production to Melvin Sacks and Melvin Sacks served his Responses thereto *after* the Atrium Lawsuit was filed, *after* Melvin Sacks was served with citation, and *after* Melvin Sacks was dismissed from the Atrium Lawsuit. Melvin Sacks did not disclose the Atrium Lawsuit and did not produce any petitions or other pleadings filed in the Atrium Lawsuit to Four Seasons and has yet to amend or supplement his responses. In fact, Melvin Sacks did not even object to Request for Production No. 37, but merely stated "None in the possession of this Plaintiff." This response was evasive, incomplete and inaccurate in light of Exhibits A-I attached to this motion and the copious number of filings from the Atrium Lawsuit which Four Seasons has now uncovered. Such blatant failure to properly respond to discovery has prejudiced Defendants' ability to defend the damages being asserted by Plaintiffs and warrants severe sanctions.

28. The discovery abuse by Melvin Sacks and his counsel, however, does not end with the failure to properly respond to written discovery. Mr. Sacks and his counsel also obstructed Four Seasons' ability to learn of the Atrium Lawsuit and the fraudulent conduct of Richard Sacks and Melvin Sacks in answers and objections at the Deposition of Melvin Sacks. Mr. Sacks testified as follows:

> Q. Jeffrey is having some type of problems right now, isn't he, or recently with embezzlement?
>
> A. No.

10

Q.      You know of no – no involvement of Jeffrey with any type of embezzlement scheme or criminal scheme?

A.      No.

Q.      And you never talked about that with your doctors?

A.      I – I spoke to doc- -- a doctor about something like that about the business, but not, you know, him embezzling money.

Q.      What did you – what were you talking about with – about Jeffrey and the business with your doctors?

A.      The structure of the business.

Q.      What were you concerned about?

A.      That it could be run a little better, like when Richard was there.

Q.      And November 29th, 2006 you were seeing Dr. Ravella?

A.      Yes.

Q.      And that's a psychologist?

A.      Yes.

Q.      And did you tell Dr. Ravella at that time about possible scenarios with Jeffrey that could include jail, a million dol- -- a million down; 100,000 over 13 months?

A.      Yes.

Q.      And what was that about?

A.      It goes back to something to do with the pricing of merchandise.

Q.      Would that in- -- within Integrated Packaging?

A.      Yes.

**Q.      And what was – did he do some illegal scheme as far as pricing merchandise?**

**A.      Not that I know of.**

Q.      Well, what were you talking about jail time? That involves a criminal act, doesn't it?

A.      I said it could possibly be.

Q.      Was he being indicted?

A.      No.

Q.      Had he been arrested?

11

    A.    No.

    Q.    Had there been some claim made about a fraudulent pricing scheme by some outside party against Jeffrey?

    A.    Yes.

    Q.    And who was that?

    MR. DUNN:    I'm going to object to it as being a part of a confidential allegation in another lawsuit that he is not at liberty to even discuss what he knows, which is virtually nothing.

    Q.    But was – whatever this scheme, did this take place prior to Richard's death or was it after Richard's death?

    A.    After Richard's death.

    Q.    And there's – is there a civil lawsuit on file against Jeffrey?

    MR. DUNN:    **I'm going to object, again**, in that the civil lawsuit, in which I know you are aware of, has been disposed of and is my understanding that that was – resulted in a confidential settlement of all those claims.

*See* **Exhibit "O,"** at 56:9-58:24.

    29.    Melvin Sacks evaded the questions posed by Four Seasons at his deposition and thwarted Four Seasons in attempts to discover the existence and circumstances of the Atrium Lawsuit. Further, the objection levied by Mr. Dunn at the Deposition was merely an attempt to thwart Four Seasons from discovering relevant and damaging information regarding Plaintiff's damages claim and IPS's fraudulent conduct. Specifically, the existence of the Atrium Lawsuit and the allegations contained therein were part of the public record and could not be subject to any privilege or confidentiality agreement. This information should have been disclosed at the deposition of Melvin Sacks. However, Plaintiffs once again utilized obstructionist tactics to prevent Four Seasons from discovering information that could significantly hinder or reduce Plaintiffs' alleged damages against the Four Seasons.

    30.    Further, the assertion of the existence of a confidentiality agreement is not supported by the record in the Atrium Lawsuit. Melvin Sacks is not a party to a Confidentiality Agreement or an Agreed Protective Order. The only Agreed Protective Order is between Jeffrey

Sacks, IPS and Atrium. In addition, the Agreed Protective Order addresses confidential information designated and exchanged between Jeffrey Sacks, IPS and Atrium – not the allegations contained within the Atrium Lawsuit. Melvin Sacks was named as a defendant in the Atrium Lawsuit and, as such, knew discoverable information relevant to the questions posed by Four Seasons but chose to hide that information.

> 31. At his deposition, Melvin Sacks also testified as follows:
>
> Q. We – before the break we were talking about some of Dr. Ravella's notes and referring again to the September 16th, 2005 entry. You indicate here – I believe you're talking about Jeffrey – always been a thief. Always will be a thief.
>
> Do you know what – were you referring Jeffrey when you told that to Dr. Ravella?
>
> A. I don't remember who we were talking about.
>
> Q. Do you consider Jeffrey to be a thief?
>
> A. No.
>
> Q. Do you know anything about Jeff blowing $2800 on marijuana, telling Dr. Ravella about that?
>
> A. No.
>
> Q. Do you know anything about Jeffrey using the company's money to buy drugs?
>
> A. No.
>
> Q. The note on September 21st, 2005 you said you were apologetic for not acting sooner, letting Jeff steal all that money.
>
> What were you referring to when you were telling Dr. Ravella about Jeffrey stealing all that money?
>
> A. I don't – I don't remember what I was referring – referring to at that time.
>
> Q. Well, did you – do you know of any instance where Jeffrey stole money?
>
> A. No.

*Id.* at 78:3-79:4.

32. Once again, Melvin Sacks was asked specific questions about fraudulent conduct that clearly implicates the fraudulent pricing scheme at IPS, but feigned ignorance and intentionally failed to candidly respond or provide any information regarding the allegations in the Atrium Lawsuit. Melvin Sacks' responses to deposition questions and his counsel's baseless objections were designed to thwart and obstruct Four Seasons' discovery in contravention to the Federal Rules. Coupled with Melvin Sacks' and his counsel's culpability in the failure to produce the Mission Investigations Report and the Hambright Report, only severe sanctions will be effective to punish and to deter such systematic abuse of the discovery process by Melvin Sacks and his counsel in this litigation.

### E.     Relief Requested

33. Four Seasons has been repeatedly and severely prejudiced by Plaintiff's failure to comply with the Rules governing discovery. Four Seasons was denied access to pivotal investigative reports for years and only obtained such reports in December 2007. Now, merely two months before the scheduled trial in this matter, Four Seasons learns that the entire basis for Plaintiffs' calculations of future lost earning capacity are flawed and that Richard Sacks, Holly Sacks On Behalf of the Estate of Richard Sacks, Melvin Sacks, Jeffrey Sacks and IPS have been sued for their direct involvement in a fraudulent revenue scheme, which has been hidden not only from Defendants and the Court, but also from Plaintiff's own damages expert, who relied on incomplete and unreliable data to prop up a mult-million dollar damages calculation. Due to the repeated, egregious discovery abuse by Plaintiff Melvin Sacks, Four Seasons requests that Plaintiffs' Complaint be stricken and Melvin Sack's claims be dismissed with prejudice, or alternatively, default judgment be entered against Melvin Sacks.

34. Lesser sanctions are not appropriate under the circumstances. A continuance will inappropriately reward Plaintiff for his abusive discovery tactics. Further, an instruction to the

jury simply will not cure the substantial prejudice that Four Seasons has incurred. As the court can appreciate, Defendants are now faced with obtaining more documents about IPS' fraudulent pricing scheme, deposing the new witnesses involved in the scheme, amending economist and damages reports and re-deposing damages experts. The magnitude of this task is substantial. Melvin Sacks repeatedly had the opportunity to candidly answer Four Seasons' questions regarding allegations against Richard Sacks, Jeffrey Sacks, Melvin Sacks, and IPS but instead chose to hide the truth and failed to be candid with this Court.

35.     Four Seasons believes that dismissal is the warranted and appropriate sanction and that lesser sanctions would not cure the significant prejudice Four Seasons faced. Alternatively, Four Seasons asks the Court to strike the Report of Dr. Thomas Mayor which is wholly unreliable. At a minimum, Four Seasons should have the opportunity to re-depose Dr. Mayor with the information from the Atrium Lawsuit. Further, Four Seasons asks this Court to re-open discovery to allow Four Seasons to re-depose Holly Sacks and Melvin Sacks regarding the information contained within the Atrium Lawsuit and overrule their baseless objections. Further, Four Seasons asks the Court to re-open discovery to enable Four Seasons to depose the individuals who provided affidavits and who were named in the Atrium Lawsuit as conspirators with Jeffrey Sacks, Richard Sacks, and Melvin Sacks and others as yet unknown. Finally, Four Seasons asks this Court to allow Four Seasons to file an Application for Attorneys' Fees and Costs to recover the attorneys' fees and investigative costs incurred to uncover the truth kept hidden by Plaintiff.

**Respectfully submitted,**

By: /s/ Jose L. Gonzalez

MARCOS G. RONQUILLO (*attorney in charge*)
State Bar No. 17226000
JOSE L. GONZALEZ
State Bar No. 08129100
RAMONA SOTO
State Bar No. 24051756

1201 Elm Street, Suite 1700
Dallas, Texas 75270-2084
(214) 939-4400 (Telephone)
(214) 760-7332 (Telecopier)
E-mail: mronquillo@godwingruber.com
E-mail: jgonzalez@godwingruber.com

**CREMER, KOPON, SHAUGHNESSY & SPINA, LLC**

WILLIAM J. CREMER
Illinois State Bar No. 6180833
180 N. LaSalle, Suite 3300
Chicago, Illinois 60601
(312) 980-3014 (Telephone)
(312) 726-3818 (Telecopier)
E-mail: wcremer@cksslaw.com

## CERTIFICATE OF CONFERENCE

This is to certify that the undersigned has conferred with Plaintiffs' counsel about the substance of this motion and the relief requested and that they are opposed.

/s/Jose L. Gonzalez
Jose L. Gonzalez

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served on the following counsel of record via the Court's ECF system this 15th day of February, 2008:

Windle Turley
Linda Turley
Law Offices of Windle Turley, P.C
6440 North Central Expressway
1000 Turley Law Center
Dallas, Texas 75206

Winford L. Dunn
Dunn, Nutter & Morgan, L.L.P.
Suite Six, Stateline Plaza, Box 8030
Texarkana, Texas 71854

/s/Jose L. Gonzalez
Jose L. Gonzalez

D  1441438 v1-12952/0016 PLEADINGS