**IN THE UNITED STATES DISTRICT COURT**
**OF THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **HOLLY ANN SACKS, Individually and** | § | |
| **as Representative of the Estate of** | § | |
| **RICHARD TODD SACKS, MELVIN** | § | |
| **PHILLIP SACKS, and MARILYN** | § | |
| **PROCTOR,** | § | |
| **Plaintiffs** | § | |
| | § | |
| **V.** | § | **No.  5:04CV73** |
| | § | |
| **FOUR SEASONS HOTEL LIMITED** | § | |
| **and FOUR SEASONS PUNTA MITA,** | § | |
| **S.A. de C.V.,** | § | |
| **Defendants** | § | |

**ORDER**

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the

Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, the following

motions were referred to the undersigned for decision:

1. Defendants' Motion for Discovery Sanctions and to Suppress and Exclude the Oral Sworn

Statements of Sergio Farias and Mariana Zardain (Docket Entry # 194);

2. Defendants' Motion for Protection and Motion for Leave to Extend the Deadlines in the

Fourth Amended Scheduling Order (Docket Entry # 195);

3. Emergency - Defendant Four Seasons Hotel Limited and Defendant Four Seasons Punta

Mita, S.A. de C.V.'s Motion for New Scheduling Order and Trial Date and Motion for Sanctions

(Docket Entry # 208); and

4. Defendant Four Seasons Hotels Limited and Defendant Four Seasons Punta Mita, S.A.

de C.V.'s Motion for Leave to Exceed Page Limitations in its Motion for Summary Judgment or for

Further Instructions from the Court Regarding the Current Deadlines (Docket Entry # 251).

The Court, having reviewed the relevant briefing and hearing arguments of counsel,[1] issues the following Order.

## I.  FACTUAL BACKGROUND

Holly Ann Sacks, Individually and as Representative of the Estate of Richard Todd Sacks, Melvin Phillip Sacks, and Marilyn Proctor ("Plaintiffs") bring this diversity cause of action against Four Seasons Hotels Limited and Four Seasons Punta Mita, S.A. de C.V. ("Defendants"), alleging on or about June 6, 2003, Plaintiff Holly Ann Sacks and Richard Todd Sacks checked into the Four Seasons Resort, Punta Mita, Mexico ("Punta Mita" or "the resort").  Plaintiffs assert negligence, breach of duty of care, wrongful death, and survival causes of action against Defendants arising from the death of Richard Sacks (the "decedent" or "Richard") on June 8, 2003, while the Sacks were staying in the resort.

Specifically, Plaintiffs allege as follows:  On June 8, 2003, Richard called the resort's front desk and asked for medical assistance.  The employees of Defendants were negligent in that they did not respond properly to Richard's request for assistance and/or his ongoing medical emergency. Defendants were negligent in that they failed to have in place policies and procedures to ensure the safety of their guests and/or failed to follow reasonable policies and procedures to ensure the safety of their guests.  Defendants were also negligent in that they failed to maintain on the premises appropriate equipment with which to respond to Richard's potentially life-threatening condition. Consequently, Richard Sacks died.

---

[1] The Court conducted an evidentiary hearing on Defendants' motions on January 23, 2008.

## II.  DEFENDANTS' MOTIONS FOR SANCTIONS

**A.     "Oral Sworn Statements" of Farias and Zardain – First motion for sanctions**.

Defendants have submitted two motions for sanctions.  In their first motion for sanctions, Defendants ask the Court to suppress the so-called "oral sworn statements" of Serio Farias ("Farias") and Mariana Zardain ("Zardain").  According to Defendants, the statements are in effect *ex parte* depositions taken without notice to Defendants and in contravention of this Court's August 27, 2007 Order.  Defendants further request the Court exclude the expert opinions of Plaintiffs' experts, Dr. Fred Del Marva ("Del Marva") and Joachim Fels ("Fels"), which rely on the *ex parte* depositions of Farias and Zardain.  Defendants ask that the reports be re-written without the information contained in the inappropriate depositions and resubmitted within thirty days.  Alternatively, Defendants propose that the Court strike Del Marva and Fels, asserting it is impossible for the experts to "forget" what they have learned from Farias and Zardain.

**B.     Mission Investigations and Hambright Reports – Second motion for sanctions**.

In their second motion for sanctions, Defendants assert Plaintiffs failed to disclose the existence of a Mission Investigations report as they were obligated to do under the Federal and Local Rules. The Mission Investigations report contains findings that Richard Sacks and Holly Sacks purchased the illegal drug ecstasy from a known drug dealer on a street corner in Mexico the night before Richard Sacks died. (Defendants' mot. at Ex. A). Defendants assert Plaintiffs willfully failed to disclose the Mission Investigations report and the witnesses named therein after numerous discovery requests by Defendants.

According to Defendants, Plaintiffs also improperly withheld, until the day before the Court's

3

evidentiary hearing January 23, another relevant report, the "Hambright report."[2]  The Hambright

report, prepared by Hambright Consulting, confirms the Sacks' purchase of marijuana in Mexico.

Addendum A thereto provides additional information, not contained in the original report, regarding

the Sacks' attempt to purchase the drug known as ectasy while in Mexico. The investigator also

indicated in Addendum A that, after some extensive effort, he was able to secure ectasy in Puerto

Vallarta which did in fact bear the cartoon figure that was previously described (presumably in the

Mission Investigations report).   Importantly, Addendum A also includes a letter from Hambright

Consulting to Marilyn Proctor that, pursuant to their agreement, Addendum A was submitted

separately from the original report and addressed "some of the 'drug issues' we discussed . . . and

agreed not to include into the body of the original report."  (Defendants' reply in support of motion

for new scheduling order and trial date and motion for sanctions at Ex. A).

Defendants request that the Court strike Plaintiffs' complaint and dismiss their claims with

prejudice.  Alternatively, Defendants request that fact discovery be reopened, leave be granted to

redepose Plaintiffs and their experts, and the discovery deadlines and trial dates be pushed back

approximately seven months to accommodate the additional discovery that must now be taken.

Defendants ask that the Court order Plaintiffs to pay all costs, fees, and expenses stemming from the

wrongful withholding of the Mission Investigations and Hambright reports.  The Court will first

consider Defendants' request to suppress the statements of Farias and Zardain.

---

[2] Defendants raised the issue of the Hambright report at the hearing January 23.  Because
they were provided the report only one day before the hearing, Defendants attached the
Hambright report to their reply regarding the Mission Investigations motion.

### III. "ORAL SWORN STATEMENTS" OF FARIAS AND ZARDAIN

**A.      Timeline**

On July 24, 2007, Plaintiffs served a Notice of Intention to take Oral Deposition of Farias

on August 31, 2007 in or near Los Cabos, Mexico. Plaintiffs also served notice to take the deposition

of non-party Clemente Carillo.  Defendants filed a motion for protective order and to quash the

noticed depositions.  According to Defendants, Farias and Carillo were not parties to the lawsuit;

they were not employed by parties to the lawsuit; and they were Mexican nationals. Defendants

asserted that as to these two witnesses, Plaintiffs failed to serve any accompanying subpoena, letter

rogatory, or Letters of Request as required under the Hague Convention on the Taking of Evidence.

On August 27, 2007, the Court granted Defendants' motion to quash.  The parties then

deposed Nancy Chicone in Mexico on August 31, 2007 (Tr. 44).  Because she is an employee of

Four Seasons, Defendants did not object to her deposition being taken.  While Plaintiffs were in

Mexico for the Chicone deposition, Plaintiffs' counsel took the "oral sworn statements" of Farias

and Zardain that are at issue in this motion.  The "statements" were conducted in question and

answer format, in English, and before a court reporter who did not speak Spanish. No interpreter was

present.  The "statements" were later transcribed.

On November 14, 2007, Plaintiffs disclosed to Defendants for the first time the existence of

the Farias and Zardain statements.  The disclosure was done by way of their production of their

expert reports of Del Marva and Fels.  The deadline for fact discovery was the next day, November

15, 2007, and the deadline for Plaintiffs to designate expert witnesses and to produce expert reports

was also November 15, 2007.

On November 20, 2007, Defendants sent a *duces tecum* request with accompanying letter for

each of Plaintiffs' expert files to be provided seven days before their scheduled depositions.  On November 27, Plaintiffs provided the requested expert file of Del Marva in advance of his scheduled deposition November 30.  Plaintiffs also produced the expert file of Fels.[3]  The files contained the witness statements in question.  This was the first time Defendants had received the transcribed statements.  According to Plaintiffs, there was no requirement that Plaintiffs produce all the written materials relied upon by their experts, but Plaintiffs voluntarily did so three days before Del Marva's deposition was scheduled.

**B.     Discussion**

According to Defendants, the so-called "oral sworn statements" of Farias and Zardain are actually *ex parte* depositions, taken contrary to the Hague Convention and this Court's August 27, 2007 Order quashing Farias' deposition.[4]  Defendants assert that after this Court quashed Farias' deposition, Plaintiffs proceeded to conduct the "oral sworn statements" of both Farias and Zardain.[5] The statements were conducted in English before a court reporter who did not speak Spanish. The witnesses were asked if they would sign the statements if provided a transcript.  What's more, Defendants contend there was no interpreter present, in violation of the Hague Convention.

Defendants state it is clear from their testimony that both Farias and Zardain have limited proficiency in English; they did not know how to express themselves in English in response to counsel's questions.  Zardain's transcript shows that the court reporter documented "Spanish words

---

[3] Fels' deposition was noticed for December 14, 2007.

[4] Farias is a former employee of Four Seasons and a citizen of Mexico.  He is not a party in this case.  Similarly, Zardain is a former employee of Four Seasons.  She is a foreign citizen living in Mexico and is not a party in this case.

[5] Unlike Farias, Zardain was never noticed for deposition by Plaintiffs.

6

spoken" with no translation at one point (Zardain Tr. at pg. 8), and Farias stated that he did not know

"what you say in English" when questioned about the defibrillator and intubation tube (Farias Tr.

at 10-11).

Defendants also take issue with the question and answer format in which the statements were

conducted, arguing, among other things, that Plaintiffs' counsel repeatedly employed leading

questions. In addition to the other alleged deficiencies outlined above, Defendants assert they had

no notice Plaintiffs were even questioning Farias and Zardain, and they were not allowed to

participate in the questioning of Farias and Zardain.

The issue before the Court is not whether Plaintiffs are prohibited from talking to potential

witnesses in Mexico and memorializing those conversations.[6]  Rather, the issue before the Court is

whether Plaintiffs may use the transcribed "oral sworn statements" of Farias and Zardain as evidence

in this case.

Plaintiffs failed to produce the statements of Farias and Zardain timely.  The fact discovery

deadline in this case was November 15, 2007.  Defendants did not even find out about the existence

of the two sworn statements, which were taken August 31, until November 14 when the statements

were referenced in Plaintiffs' experts' reports, furnished the day before the fact discovery deadline.

This is in contravention of their obligation under Rule 26(a)(1) and Rule 34 to produce and

supplement fact discovery.  Federal Rule of Civil Procedure 26(a)(1) provides that a parties' initial

disclosures include copies of all documents that the disclosing party may use to support its claims

---

[6] The Court declines in this instance to decide whether the "oral sworn statements" should be considered depositions taken in violation of this Court's August 27 Order and in contravention of the Hague Convention requirements. By not considering it, the Court is in no way condoning Plaintiffs' actions.

or defenses.  FED. R. CIV. P. 26(a)(1)(B).   Plaintiffs' experts, Del Marva and Fels, relied in part on

the sworn statements in their expert reports.  Given that Plaintiffs' experts relied on the transcribed

copies of the "oral sworn statements" of Farias and Zardain in compiling their expert reports,[7]

Plaintiffs are using the transcribed oral sworn statements of Farias and Zardain to support their

claims or defenses as contemplated by Rule 26(a).  Federal Rule of Civil Procedure 26(e)(1) requires

a party to supplement "at appropriate intervals" its disclosures under 26(a) if the party learns that in

some material respect the information disclosed is incomplete or incorrect and if the additional or

corrective information has not otherwise been made known to the other parties during the discovery

process or in writing.  FED. R. CIV. P. 26(e)(1).

Defendants repeatedly requested such documents in their written discovery to all Plaintiffs.

For example, Request for Production No. 39, served on Plaintiff Holly Sacks on September 20, 2004,

requested "[a]ll statements of any person pertaining to the Lawsuit."  (Defendants' reply, Ex. A at

pg. 10).  Similarly, First Request for Production No. 56, served on Plaintiff Melvin Sacks on July

25, 2007, requested "[a]ll statements of any person pertaining to the Lawsuit."  (Defendants' reply,

Ex. D at pg. 12).  Federal Rule of Civil Procedure 26(e)(2)  requires a party to "seasonably" amend

a prior response to a request for production "if the party learns that the response is in some material

respect incomplete or incorrect and if the additional or corrective information has not otherwise been

made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(2).

A federal court has both specific and inherent power to control its docket, including the

power to dismiss a case. Federal Rule of Civil Procedure 37 provides that if a party fails to disclose,

---

[7] Plaintiffs' experts' reports were provided to Defendants on November 14, referencing
for the first time the transcripts of the sworn statements.  Defendants were not provided actual
copies of the transcripts until November 27, 2007.

makes a false or misleading disclosure or refuses to admit information, without substantial justification, or fails to amend the response to discovery under Rule 26(e)(2), the Court may impose appropriate sanctions.  FED. R. CIV. P. 37(c).  "In addition to requiring a payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include information the jury of the failure to make the disclosure." *Id.*  Rule 37(b)(2) provides that the Court may, among other things, enter an "order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the party from introducing designated matters in evidence."  FED. R. CIV. P. 37(b)(2)(B).  The Court may also enter an order "striking out pleadings or parts thereof . . . or dismissing the action or proceeding or any part thereof. . . ."  FED. R. CIV. P. 37(b)(2)(C).

Here, Plaintiffs failed to supplement both their initial disclosures and their discovery responses in a timely fashion.[8]  Plaintiffs obtained the Farias and Zardain transcripts on September 5, 2007, yet Plaintiffs improperly withheld disclosure of even the existence of the transcripts until November 14, 2007.  More importantly, Plaintiffs did not produce the transcripts of the sworn statements to Defendants until November 27, 2007, twelve days after the fact discovery period had

---

[8] Clearly, the transcripts of the "oral sworn statements" are relevant fact discovery. Notwithstanding the requirement under Rule 26(a) that initial disclosures are limited to documents and information the <u>disclosing party</u> may use to support its claims or defenses, Rule 26(b)(1) provides that the scope of the parties' discovery requests includes any matter, not privileged, that is relevant to the claim or defense of <u>any party</u>. Local Rule CV-26(d) provides guidance in evaluating whether a particular piece of information is "relevant to the claim or defense of any party."  Rule 26(d) provides, in pertinent part, as follows: (1) information is relevant if it is information likely to have an influence on or affect the outcome of a claim or defense; (2) information is relevant if it is information that deserves to be considered in the preparation, evaluation or trial of a claim or defense; and (3) information is relevant if it is information that reasonable and competent counsel would consider reasonably necessary to prepare, evaluate or try a claim or defense.

closed and almost three months after Plaintiffs had received the transcripts. Not only did Plaintiffs fail to provide this "supplementation" timely and within the fact discovery deadline, but Plaintiffs only did so after being prompted by Defendants.  It was only after Defendants requested the experts' files and three days before Del Marva's deposition that Plaintiffs produced the actual transcripts.

Considering all of the circumstances and after giving Plaintiffs an opportunity to be heard, the Court finds Plaintiffs were not substantially justified in failing to produce the Farias and Zardain transcripts on or "seasonably" after their receipt of the transcripts on September 5, 2007.  FED. R. CIV. P. 26(e)(2); FED. R. CIV. P. 37(c).  At a minimum, the transcripts should have been produced to Defendants when Plaintiffs provided them to their experts for use in their expert reports.  The Court grants Defendants' motion and finds sanctions are warranted in this instance.

The Court hereby strikes the statements of Farias and Zardain as well as the transcriptions of said statements.  The Court further strikes those portions of the expert reports of Del Marva and Fels which rely on the statements of Farias and Zardain. Del Marva and Fels shall formulate opinions without relying upon or using in any way the contents of the statements.  Plaintiffs shall resubmit the expert reports of Del Marva and Fels within thirty days from the date of entry of this Order.

## IV.  THE MISSION INVESTIGATIONS AND HAMBRIGHT REPORTS

### A.    Facts

The Court provides the following timeline, taken from the parties' briefing and the testimony and oral argument at the January 23 hearing.  When Plaintiffs filed this lawsuit on August 2, 2004, Plaintiffs were jointly represented by attorney John David Hart.  Mr. Hart did not initially disclose, pursuant to Rule 26(a)(1), a report by Mission Investigations; the name of the author of the report, Samuel Zamora; or the names of any of the witnesses named in the report. (Defendants' mot. at Ex.

B).  Plaintiff Holly Sacks,[9] as Representative of the Estate of Richard Sacks, stated on November 5, 2004, in response to Defendants' Request for Production No. 37, subject to objection, that documents prepared by an investigator concerning Richard Sacks' death were privileged,[10] but no privilege log was ever produced. (Defendants' mot. at Ex. C). Plaintiff Holly Sacks, individually, stated on November 5, 2004 in response to Defendants' Request for Production No. 26 that documents prepared by an investigator concerning Richard Sacks' death were privileged,[11] but no privilege log was ever produced. (Defendants' mot. at Ex. D). Plaintiff Holly Sacks never identified the existence of a specific report in her discovery responses.[12]

―――――――――――――

[9] Holly Sacks is the surviving spouse of Richard Sacks.

[10] Specifically, Holly Sacks responded as follows:
> The requested discovery is overly broad as to the scope of the information requested.  FRCP 26(b)(1),(2).  Further, this information request[s] attorney work product and trial preparation material that is not discoverable.  FRCP 26(b)(3).  This request also asks Plaintiff to produce consulting only expert information and privileged information.   This request includes consulting only expert information and attorney work product relating to witness statements and liability evaluations.

[11] Specifically, Holly Sacks responded as follows:
> The requested discovery is overly broad as to the scope of the information requested.  FRCP 26(b)(1),(2).  Further, this information request[s] attorney work product and trial preparation material that is not discoverable.  FRCP 26(b)(3).  This request also asks Plaintiff to produce consulting only expert information and privileged information.   This request includes consulting only expert information and attorney work product relating to witness statements and liability evaluations.

[12] According to Holly Sacks, her counsel had possession of the Hambright report (with the exception of Addendum A thereto). She did not have possession of the Mission Investigations report until January of this year.  Plaintiffs' current counsel assert it was not until August 7, 2007 that they were made aware of the Mission Investigations report when Melvin Sacks provided a copy to Winford Dunn, his current counsel.

On May 2, 2005, Plaintiffs' then attorney, John David Hart, was allowed to withdraw, representing there was a conflict of interest.[13] Plaintiffs were allowed thirty days in which to retain new counsel. Plaintiffs Melvin Sacks and Marilyn Proctor, parents of the decedent, retained Winford Dunn.  Plaintiff Holly Sacks retained the Law Offices of Windle Turley.  According to all Plaintiffs' current counsel, there is no evidence in the file that Mr. Hart ever had knowledge of the Mission Investigations report.  The only report counsel for Plaintiffs had prior to August 7, 2007 was the Hambright report.

On July 20, 2005, Defendants filed a Motion to Dismiss Under the Doctrine of Forum Non Conveniens. After oral argument, the undersigned issued a Report and Recommendation on March 7, 2006, recommending denial of Defendants' motion. And on March 24, after considering Defendants' objections, District Judge David Folsom adopted the Report and Recommendation as the findings and conclusions of the Court. Defendants filed a Motion for Certification for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) on April 3, 2006.

After the Court granted Plaintiffs' motions to strike,[14] Defendants then filed the two separate "renewed" motions.[15]  The Court heard oral argument on July 24, 2006.  On September 25, 2006, the Court stayed all deadlines in the case pending the Court's entry of an Order on Defendants'

---

[13] The Court does not know what the conflict of interest involved.

[14] Plaintiffs moved to strike the motion for certification because the motion exceeded the page limit and Defendants failed to confer with Plaintiffs before filing.

[15] *See* Renewed Motion for Certification Pursuant to 28 U.S.C. § 1292(b) of the Court's Denial of Defendants' Forum non Conveniens Motion to Dismiss (Docket Entry # 98); *see also* Renewed Motion for Certification Pursuant to 28 U.S.C. § 1292(b) of the Court's Application of Texas Law to Liability Pursuant to Rule 44.1 and Application of Texas Law to Damages Pursuant to Rule 44.1 (Docket Entry # 99).

renewed motions for certification. On October 19, the Court granted Defendants' renewed motions for certification and certified the Court's Order of March 24, 2006 for interlocutory appeal.  The Fifth Circuit Court of Appeals, January 22, 2007, denied leave to appeal from the interlocutory order of the Court. A Second Amended Scheduling Order was entered March 12.

Even though Defendants had served broad discovery requests in 2004 seeking all documents prepared by an investigator, Defendants specifically asked about the Mission Investigations report in August of 2007.[16]  Defendants Second Request for Production No. 1, served upon Melvin Sacks and Marilyn Proctor, sought all "correspondence between you and Mission Investigations whether the investigation was initiated by Plaintiffs or relatives of Richard T. Sacks."  At that time, counsel for Melvin Sacks and Marilyn Proctor, Winford Dunn, asked Plaintiffs specifically about investigation reports.  Plaintiff Melvin Sacks disclosed that there had been an investigation by Mission Investigations and that he had a copy of the report.  Although Melvin Sacks had provided a copy of the Hambright report to Mr. Hart, he had not provided a copy of the Mission Investigations report to him.  It was not provided to current counsel until August of 2007.  In August of 2007, Melvin Sacks also forwarded to his counsel Addendum A to the Hambright report that had not been produced earlier.  Counsel for Marilyn Proctor and Melvin Sacks then provided the Mission Investigations report to Holly Sacks' counsel.

Neither counsel for Plaintiffs disclosed the Mission Investigations report, the name of the

---

[16] Defendants had earlier learned that the "Sacks ha[d] retained the services of Mission Investigations to obtain information [regarding Richard's death] on their behalf."  (Defendants' mot. at Exh. A, pg. 17).  Specifically, in June of 2003, Jeffrey Sacks' sister-in-law, JillYsasaga wrote a letter to the assistant general manger at the Four Seasons Punta Mita, informing the resort that Jeffrey Sacks and Marilyn Proctor authorized the release of any and all information concerning Richard Sacks in the possession of the resort.

investigator, or the witnesses named in the report in later supplemental Rule 26 disclosures made September 21, 2007 and October 1, 2007. (Defendants' mot. at Exs. P and Q).  On September 25, 2007, Plaintiff Holly Sacks responded to a request for production seeking any report or finding issued and/or prepared by Mission Investigations as it relates to Richard T. Sacks that, subject to objection, she had no correspondence regarding the initiation of an investigation by Mission Investigations or any report by Mission Investigations. (Defendants' mot. at Ex. R).  Specifically, Holly Sacks objected to the request and then answered, "[w]ithout waiving these objections and privileges, none." *Id.*

Plaintiffs Melvin Sacks and Marilyn Proctor's responses to Defendants' request for production seeking a report by Mission Investigations, dated September 28, 2007, indicated that they had no responsive documents, but they also asserted attorney-client and attorney work-product privileges. (Defendants' mot. at Ex. G). Specifically, both Melvin Sacks and Marilyn Proctor asserted various privileges, and then answered that "[w]ithout waiving these objections and privileges, none." *Id.*  No Plaintiff produced a privilege log.

As late as October 31, 2007, Plaintiffs' counsel represented that no documents responsive to Defendants' discovery requests existed. Attorney Winford Dunn signed and returned a letter from defense counsel expressly agreeing that the statement was true. (Defendants' mot. at Ex. S).  On November 7, 2007, Defendants served a Notice of Intention to take the Deposition by Written Questions of Mission Investigations. (Defendants' mot. at Ex. H). The deposition was scheduled for November 21, 2007.

On November 15, 2007, Plaintiffs Melvin Sacks and Marilyn Proctor filed a Motion to Quash and a Motion for Protection, asserting attorney-client and attorney work-product privileges over the

production of Mission Investigations records and also filed, for the first time, a privilege log containing a description of a five-page report prepared by Samuel Zamora of Mission Investigations. (Defendants' mot. at Exs. I and J). Plaintiffs represented that the report was prepared at the request of counsel and in contemplation of and in order to facilitate the current litigation, and as such was work product.

On December 6, 2007, this Court issued an order denying Plaintiffs Melvin Sacks' and Marilyn Proctor's motions. The Court assumed the Mission Investigations report was ordinary work product based on Plaintiffs' representations. However, according to the Court, Defendants had shown that the requested information was relevant; that they had a "substantial need" for the requested information; and that they were unable without undue hardship to obtain the substantial equivalent of the materials by other means. FED. R. CIV. P. 26(b)(3). Therefore, the Court concluded information regarding the results of Mission Investigations' investigation was discoverable.

Defendants received the Mission Investigations report on December 21, 2007 from Mission Investigations in response to the Court's order. (Defendants' mot. at Ex. A). According to Defendants, Plaintiffs Melvin Sacks and Marilyn Proctor have yet to produce the Mission Investigations report and other materials in their possession.

On January 9, 2008, Defendants filed their current motion for sanctions. The Court issued an Order scheduling Defendants' motions for an evidentiary hearing January 23, 2008. The Court ordered the attendance of Plaintiffs Holly Sacks, Melvin Sacks, and Marilyn Proctor at the evidentiary hearing.

Two days before the January 23 hearing, Plaintiff Holly Sacks filed a Notice of Withdrawal of Privilege Assertion as to the Hambright report even though no privilege log has ever been filed

15

by any of the Plaintiffs containing a description of the Hambright report.  Yet, Plaintiff Holly Sacks

maintained that she had correctly asserted work product and attorney-client privilege in response to

discovery requests to the Hambright report.  Holly Sacks produced the report pursuant to the Court's

December 6, 2007 Order denying Plaintiff Melvin Sacks and Marilyn Proctor's motion to quash

subpoena and for protection, thus allowing production of the Mission Investigations report.  Counsel

assumed the Hambright report would be treated the same way if challenged.

On January 23, 2008, the date of the Court's hearing, Defendants filed a response to Holly

Sacks' notice, asserting that before January 21, 2008, Holly Sacks had failed to disclose to

Defendants the <u>existence</u> of the Hambright report nor had she even produced a privilege log

regarding the report.  Therefore, Defendants again seek sanctions up to and including the dismissal

of Plaintiff Holly Sacks' lawsuit for failure to produce or even identify the Hambright report.

**B.      Defendants' supplementation of the record of the January 23 hearing and Plaintiffs'
         responses**

On February 8, 2008, the Court granted Defendants' motion for leave to supplement the

record of the January 23 hearing with the affidavits of Samuel Zamora and Daniel Phillips. Samuel

Zamora ("Zamora") is the author of the Mission Investigations report.  In his affidavit, Zamora

testifies about his contacts with the Sacks family prior to conducting his investigation and after

delivery of the Mission Investigations report.  Zamora attached exhibits to his affidavit from the files

of Mission Investigations, including a letter dated November 13, 2007 from Melvin Sacks and

Marilyn Proctor's counsel, Winford Dunn, in which Mr. Dunn asks Mission Investigations not to

produce the Mission Investigations report to Defendants until it receives notice by the Court that

authorizes such production.

16

Daniel Phillips ("Phillips") is the head of Mission Investigations. Phillips testifies that his initial contact was with Marilyn Proctor and that she is the one who gave direction to Mission Investigations about the scope of the investigation.  Phillips also attached to his affidavit records from Mission Investigations.

The Court allowed Plaintiffs the opportunity to file supplemental argument and evidence in response to Defendants' supplemental evidence. On February 18, 2008, Holly Sacks filed a response, asserting Zamora's affidavit only refers to the Mission Investigations report which Holly Sacks knew nothing about until August of 2007.

Plaintiffs Melvin Sacks and Marilyn Proctor also filed a response.  Counsel first explains that his letter dated November 13, 2007 to Mission Investigations was for the purpose of putting Mission Investigations on notice that a motion was being filed with the Court.  Counsel asserts there is nothing improper regarding the letter.  Counsel also attached to the response affidavits of Marilyn Proctor and Melvin Sacks.  Marilyn Proctor asserts her first occasion to have copy of the Mission Investigations report itself was after August of 2007 when her attorney forwarded it to her after receiving a copy from Melvin Sacks.  (Proctor Aff. pg. 2).   Proctor further states in her affidavit that she never discussed the Mission Investigations investigation or report with her previous counsel. (Proctor Aff. pg. 3).  Proctor asserts both she and Zamora acknowledged to each other at the January 23 hearing that they had never met in person. (Proctor Aff. pg. 5). Proctor further acknowledges that she did speak by telephone with Zamora and Phillips, but she takes issue with a number of their assertions regarding the purpose of the investigation and regarding Holly Sacks.  (Proctor Aff. pg. 4).

In his affidavit, Melvin Sacks affirms his previous testimony provided to the Court at the

January 23 hearing. Melvin Sacks supplements his testimony with additional information regarding the date and amount of the payments he made to Mission Investigations. (Sacks' Aff. pg. 1). Melvin Sacks believes Proctor did not meet at anytime with Zamora as Zamora set out and described in his affidavit. (Sacks' Aff. pg. 1). Mr. Sacks' affidavit further asserts that he heard Proctor introduce herself to Zamora at the Court's January 23 hearing, and Zamora stated that he was pleased to meet her, indicating that he was meeting Proctor for the first time. (Sacks' Aff. pg. 2).

### C.     The Mission Investigations Report

### 1.     Plaintiffs' Deposition Testimony

Defendants first seek sanctions against all Plaintiffs, asserting the Mission Investigations report, improperly withheld by Plaintiffs, is a key piece of evidence in showing what actually occurred in Mexico on the dates in question and in proving Four Seasons' defense and affirmative defenses. The Mission Investigations report contains new evidence, including previously undisclosed witnesses and information. Importantly, the report provides that Richard Sacks and Holly Sacks purchased the illegal drug ecstasy from a known drug dealer on a street corner in Mexico the night before Richard Sacks died. (Defendants' mot. at Ex. A).[17] According to Defendants, the sworn deposition testimony of all three Plaintiffs denies knowledge of this.

Plaintiff Holly Sacks stated in her deposition taken on October 5, 2007 that to her knowledge, she and Richard Sacks had used ecstasy in 2002 and not in 2003. (Defendants' mot. at Ex. M, pgs. 42-43, 70-71). Although Plaintiff Holly Sacks testified Richard purchased marijuana while on their trip in Mexico, she never mentioned any purchase of ecstasy in Mexico the night before his death.

---

[17] This information is critical to Defendants' case, as Plaintiffs are alleging Richard Sacks died from a heart attack, and Defendants failed to maintain on the premises appropriate equipment with which to respond to Richard's life-threatening condition.

*Id.* Plaintiff Melvin Sacks stated in his deposition taken on October 11, 2007 that he knew about Richard's drug use prior to his death, but only marijuana, and Melvin Sacks specifically did not know about ecstasy use. (Defendants' mot. at Ex. N). He also stated he did not have any specific knowledge of what type of drugs Richard was using, and that all his information on the subject came from Holly Sacks. *Id*.

When asked about her son's possible use of ecstasy, Plaintiff Marilyn Proctor stated in her deposition taken on October 29, 2007 that she "would be very –very surprised because he would be afraid" to use ecstasy. (Defendants' mot. at Ex. O, pg. 23). Plaintiff Marilyn Proctor stated that she did not know of Richard's drug use other than smoking marijuana. Proctor stated that she was not aware that Richard Sacks had purchased marijuana from a stranger in Mexico because Plaintiff Holly Sacks did not divulge this information and if she had known about this information she would have insisted that the drug be preserved and a toxicology screen or something of that nature be done. *Id.* at pgs. 40-41.

However, the June 28, 2003 Mission Investigations report, following Richard Sacks death June 8, states:

> At some point between 11:30 and midnight [on June 7, 2003], Holly exited the restaurant and met with Arturo and she handed him two bills.  He then handed her what the witnesses later learned from Arturo were "Ectasy" pills with a cartoon character inscribed on the pill believed to be Bugs Bunny.  Richard later exited and ran down the steps to the vehicle and departed.  They returned to the Four Seasons around 1:00 according to George Arias who is a front gate attendant.  He said it did appear that the couple had been drinking but appeared to be fine otherwise.

(Defendants' mot. at Ex. A, pg. 2).

The report further provides that the "results of this investigation have been discussed with both of the [p]arents and Jeff Sacks as well as Attorney Paul Kelly. And a report has been submitted

19

for all to review. . . ." (Defendants' mot. at Ex. A, pg. 4). In addition, the report lists Mission Investigations' client as the "Sacks Family."

According to Samuel Zamora's affidavit, in early June of 2003, he was given by his employer, Mission Investigations, the contact names of Marilyn Proctor and Jeffrey Sacks as the new client. (Zamora Aff. ¶¶ 5-6).[18]  Zamora first met with Jeffrey Sacks alone in Jeff's office. (Zamora Aff. ¶ 7).  Later, still in early June of 2003, Zamora arranged a second meeting where he personally met with Marilyn Proctor, Melvin Sacks, and Jeffrey Sacks at Jeff's office to discuss the new case. (Zamora Aff. ¶ 8).  No lawyers were present at this meeting.  "Marilyn Proctor was the person in control and did most of the talking at this meeting."  (Zamora Aff. ¶ 8).

According to Zamora's affidavit:

> Marilyn Proctor informed me that the reason she hired Mission Investigations was because she was suspicious about her son's death and that she did not believe the story that the wife, Holly Sacks, had told her surrounding the death of her son or the circumstances of his death.  She specifically told me that she was especially concerned about Holly Sacks' explanation that Richard Sacks had a heart attack and died. . . .  When I inquired about motive as to why she suspected the wife, Marilyn Proctor told me that her son's company was worth about $3 million and that Holly Sacks would inherit Richard Sacks' interest in the company in the event of his death. She very clearly told me that she suspected Holly Sacks might be hiding something from the family about her son's death and their activity while in Mexico.

(Zamora Aff. ¶¶9-10).  Zamora states he was specifically instructed by Marilyn Proctor, Melvin Sacks, and Jeffrey Sacks to find out about the use of drugs by Holly and Richard Sacks while they were in Mexico.  (Zamora Aff. ¶ 12).

---

[18] Daniel Phillips' affidavit provides that on or about June 15, 2003, Marilyn Proctor called Mr. Phillips, wanting to hire Mission Investigations to conduct an investigation into the death of Richard Sacks.  (Phillips' Aff. ¶ 4).  Attached to Phillips' affidavit is a copy of an intake form for Mission Investigations dated June 16, 2003 which provides the contact information for Marilyn Proctor, the mother of Richard Sacks. (Phillips' Aff. ¶ 5).

After Zamora completed his investigation and submitted his report, Marilyn Proctor called wanting to meet with Zamora to discuss the report and findings.  (Zamora Aff. ¶ 15).  In early July of 2003, Zamora met with Marilyn Proctor, Melvin Sacks, and Jeffrey Sacks (the "Sacks family") at Jeff's home in Dallas, Texas.  Zamora specifically discussed the findings in his report about the purchase of ectasy by Holly Sacks.  No lawyers were present at this meeting, and Zamora did not report his findings to any lawyer.  (Zamora Aff. ¶15).  After the meeting, Marilyn Proctor told Zamora that she had confronted Holly Sacks about Sacks' purchase of ectasy during the vacation in Mexico, and Marilyn indicated to Zamora that she wanted him to conduct surveillance on Holly Sacks to see if she was seeing someone else.  (Zamora Aff. ¶ 15).

A few weeks after Zamora's meeting with the Sacks family, Marilyn Proctor called Zamora and told him to expect a call from an attorney by the name of Lawrence J. Friedman.  Mr. Friedman called and asked Zamora to come to his office and discuss the case with him (Zamora Aff. ¶ 17).  Zamora was not hired by Mr. Friedman or his law firm, Friedman & Feiger, in connection with his work for the Sacks family concerning the death of Richard Sacks.  At the meeting, Zamora gave Mr. Friedman a copy of the Mission Investigations report which Mr. Friedman read while Zamora was in his office.  While Zamora was present in Mr. Friedman's office, Mr. Friedman called Marilyn Proctor on the telephone and told her that based on the information in the Mission Investigations report, he did not believe she had any action against Four Seasons and that he would not represent her because "everything in the report was pointing the fingers at Holly Sacks."  (Zamora Aff. ¶ 17).

## 2.    Plaintiffs' Testimony at the January 23 Hearing

Plaintiff Melvin Sacks testified at the hearing as follows.  Mr. Sacks was personally involved in getting the Mission Investigations investigation conducted in June of 2003 (Tr. 128).  After

Richard's death on June 8, 2003, attorney Paul Kelly suggested that the family do the investigation (Tr. 128).  Paul Kelly played an advisory role only (Tr. 139).  He did not tell Mr. Sacks who to hire or how to go about hiring an investigation company (Tr. 139), nor did his law firm retain Mission Investigations (Tr. 140).  Mr. Sacks either looked up Mission Investigations in the phone book or asked a female attorney for the name of an investigation company (Tr. 128). Mr. Sacks and Jeffrey Sacks, Richard's brother, hired Mission Investigations, and Jeffrey paid Mission Investigations either $3,000 or $3,500 (Tr. 141, 148-49).

Mr. Sacks received a hard copy of the Mission Investigations report, dated June 28, 2003 (Tr. 142).  Mr. Sacks thinks he had a meeting with the investigator, Mr. Zamora, to go over the written report (Tr. 131, 144).  Marilyn Proctor was not present at the meeting (Tr. 131).[19]  No attorney was present at the meeting (Tr. 144).  Mr. Sacks did not discuss the Mission Investigations report with Holly Sacks (Tr. 131).

Mr. Sacks did not believe the contents of the first report at all (Tr. 134).  Mr. Sacks does not think Richard would take anything that would endanger his health; he was "very vain" and "loved himself too much." (Tr. 145). Mr. Sacks wanted another investigation conducted so that he could compare the two reports (Tr. 134).  Mr. Sacks then contacted Friedman & Feiger, Jeffrey Sacks' corporate attorneys, to retain another investigator (Tr. 132, 149).  Friedman & Feiger had an investigator (Hambright) that they thought was more thorough than Mission Investigations (Tr. 133, 149).   According to Mr. Sacks, Friedman & Feiger's role was limited to investigating the circumstances surrounding the death of Richard Sacks (Tr. 150).  Melvin Sacks paid Friedman and

---

[19] Mr. Sacks does not remember discussing the Mission Investigations report with Marilyn Proctor; it is possible Jeffrey discussed the report with her.  (Tr. 146).

Feiger $10,000 for their services.  (Tr. 150-51).

The Hambright report is dated September 6, 2003 (Tr. 151).  Mr. Sacks also received a hard copy of that report (Tr. 151).  Mr. Sacks does not recall meeting with the attorneys to discuss the report; Jeffrey Sacks did (Tr. 138).  Mr. Sacks talked to Jeffrey about the report (Tr. 151).  Mr. Sacks did not believe the things included in the report dealing with Holly Sacks (Tr. 152).  Mr. Sacks did not discuss the results of the Hambright report with Holly (Tr. 153).  Because Friedman & Feiger did not handle this type of case, Mr. Sacks decided to retain the advice of attorney John Hart (Tr. 155).

Mr. Sacks had filed the Mission Investigations report in his office (Tr. 155-56).  When Mr. Sacks engaged the services of Mr. Hart, Mr. Sacks did not provide him with a copy of the Mission Investigations report.  Even though Friedman & Feiger recommended that Mr. Sacks provide copies of the Mission Investigation report to his counsel (Tr. 155, 157), as an oversight, Mr. Sacks failed to provide the Mission Investigations report to Mr. Hart (Tr. 157).  Mr. Sacks did provide a copy of the Hambright report though to Mr. Hart (Tr. 156).

In August of 2007, after his current counsel, Winford Dunn asked him about investigation reports in his possession, Mr. Sacks for the first time gave the Mission Investigations report to his counsel.  Mr. Sacks testified he was not asked for it before that time and never thought to give it to his counsel (Tr. 130).[20]

---

[20] The Court is suspect of Melvin Sacks' testimony that his not giving his attorney the Mission Investigations report was an oversight.  (Tr. 136, 157).  His son paid $3000 - $3500 for the report (Tr. 134, 148-49); the report states that Mr. Zamora discussed the results of the investigation with Mr. Sacks and Marilyn Proctor; Mr. Sacks commissioned another investigation and was instructed by the firm of Friedman & Feiger to give that report to his attorney (Tr. 155, 157); he answered negatively under oath specific questions regarding whether he had any investigative reports; and the report specifically addresses the facts in dispute in this

Plaintiff Holly Sacks also testified at the hearing.  Holly testified she never hired a person or company to investigate Richard's death (Tr. 110).  Holly never talked with anyone from Mission Investigations, and she had never seen any report from Mission Investigations until early 2008 (Tr. 111).  Regarding the Hambright report, Holly testified she never talked with anyone at Hambright investigations (Tr. 111).  Holly had no idea the Addendum A to the Hambright report even existed (Tr. 111-12).

Holly testified that contrary to the Mission Investigations report, Richard was not wearing jeans to dinner the night before Richard's death (Tr. 114).  According to Holly, Richard was wearing a blue and white striped shirt and shorts (Tr. 115).  Holly further testified that she was not wearing a brown pantsuit that night as provided in the Mission Investigations report, but a long white skirt (Tr. 115).  Holly introduced two photographs into evidence at the hearing, showing the Sacks in outfits as described by Holly.[21]

Holly testified that she did not ask for anyone to get her drugs, and she did not buy drugs from anyone (Tr. 117).  Holly was with her husband the night before his death, and she did not hear Richard ask anyone where he could get ectasy or Viagra (Tr. 118).   Richard never used Viagra to Holly's knowledge (Tr. 119).  Holly never saw any pills with a bugs bunny or other picture on them (Tr. 119).

---

lawsuit.  His not turning it over to his attorneys over a four year period due to an oversight defies credulity.

[21] Even though the Court asked Mr. Turley, Holly's counsel, about a statement he made challenging the veracity of the contents of the Mission Investigations report (Tr. 106-07), the Court's evidentiary hearing clearly focused on the timing of the production of the report. Plaintiff Holly Sacks' testimony would be relevant if Defendants had the report and were using it against Plaintiffs.  At this time, the relevant testimony is only that pertaining to her knowledge of the reports and her failure to produce them.

Regarding the marijuana purchased by Richard in Mexico, Holly testified that Richard asked the driver of the van about where he could purchase some marijuana.  The driver responded that he could get some (Tr. 120-21).  After dinner, Holly and Richard got back into the van, and the van drove somewhere in the city (Tr. 121).  The driver went into a house and brought out one baggie of marijuana (Tr. 121).

**3.      Discussion regarding the Mission Investigations Report**

The information contained in the Mission Investigations report is relevant and critical to the defense of this case. Plaintiffs contend that Richard Sacks had a heart attack based on genetic predisposition and that he could have survived if he received prompt emergency transport and medical services. The new evidence contained in the Mission Investigations report throws open the issue of the cause of Richard Sacks' death, the cause of which could now possibly be illegal drug use, as well as the contributory negligence of Richard and Holly Sacks.  The use of unregulated, illicit drugs raises the possibility that no emergency medical response could have saved Richard Sacks.  What's more, Holly Sacks made the decision not to have an autopsy, which would have included a toxicology screening, making the information in the report even more important.

Regardless of Holly Sacks' testimony and the photographs introduced into evidence at the January 23 hearing, Defendants are entitled to conduct their own investigation as to the drug issue referenced in both the Mission Investigations and Hambright reports.  If the Mission Investigations report is true that the couple bought ectasy while on vacation in Mexico, it is appropriate for Defendants to argue that Richard used it while in Mexico in June of 2003.  It is undisputed that Richard had purchased and used marijuana while in Mexico in June of 2003. (Defendants' mot. at Ex. M, pgs. 69-71).

25

Multiple interrogatories and requests for production were served on Plaintiffs, asking for documents prepared by an investigator. It is undisputed that Plaintiff Melvin Sacks had the Mission Investigations report for four years and did not provide it to his counsel. The Mission Investigations report was not even identified by Melvin Sacks until August of 2007.  After Plaintiffs' counsel's receipt of the Mission Investigations report in August 2007, Plaintiffs' counsel did not acknowledge to Defendants the existence of the Mission Investigations report until November 15, 2007, the final day of fact discovery, despite the repeated attempts to discover the report by Defendants.  The report was not produced nor was a privilege log produced before November 15, 2007 describing it. Defendants were relegated to getting the report from Mission Investigations directly.

When Mr. Sacks' attorney was made aware of the Mission Investigations report August 7, 2007, he failed to produce a privilege log identifying the report.  He stood on the prior blanket, generic objections to Defendants' multiple requests for production.  There was no information given to Defendants to prompt them to challenge any privilege. Plaintiffs Melvin Sacks and Marilyn Proctor first admitted the existence of the June 28, 2003 Mission Investigations report on November 15, 2007, the final day of fact discovery, by submitting a privilege log in connection with Plaintiffs' motion to quash subpoena and for protective order. The privilege log was produced only after Defendants subpoenaed documents from Mission Investigations.[22]

Plaintiffs argue Defendants have not suffered prejudice, asserting among other things, that Defendants were aware of the Mission investigation before Plaintiffs' current counsel.  Defendants

---

[22] Defendants also assert that given Melvin Sacks' testimony at the January 23 hearing, Plaintiffs claimed attorney client and work product privilege without any foundation for doing so. There was no evidence produced to the Court that the report was done for or at the direction of any attorney representing Plaintiffs.  The Sacks family hired the Mission investigator, not attorneys.

had earlier learned that the "Sacks ha[d] retained the services of Mission Investigations to obtain information [regarding Richard's death] on their behalf."  (Defendants' mot. at Exh. A, pg. 017). In June of 2003, Jeffrey Sacks' sister-in-law, JillYsasaga[23] wrote a letter to the assistant general manger at the Four Seasons Punta Mita, informing the resort that Jeffrey Sacks and Marilyn Proctor authorized the release of any and all information concerning Richard Sacks in the possession of the resort.  Importantly, Defendants assert Plaintiffs' previous counsel produced the June 2003 letter to Defendants during discovery.

Although the letter references Mission Investigations, Defendants represent they had no knowledge about the existence of a Mission Investigations report until November 15, 2007.  The Court has reviewed the letter and nothing contained therein mentions a  report. According to Defendants, the only way they learned the name of Mr. Zamora, the author of the Mission Investigations' report, was when Melvin Sacks' and Marilyn Proctor's counsel filed their motion to quash and for protective order in November 2007.

Not only did they not describe the report in their arguments to discovery, they also failed to list it on a privilege log.  Regardless of Defendants' knowledge of an investigation by Mission Investigations, when Plaintiffs' counsel received a copy of the Mission Investigations report from Melvin Sacks, at a minimum, they were required to list the report on a privilege log at that time. Federal Rule of Civil Procedure 26(b)(5)(A) requires that when a claim of privilege or protection of trial-preparation material is made, the party claiming the privilege shall "make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed

---

[23] Ms. Ysasaga is an attorney with Gruber, Scott, Henderson & Allen LLP in Houston, Texas.

in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." FED. R. CIV. P. 26(b)(5)(A).  Here, Plaintiffs failed to make their privilege claim expressly or to describe the nature of the Mission Investigations report in such a manner that would enable Defendants to assess the applicability of the privilege or protection within the fact discovery period.

Without question, identifying for the first time in the nearly four year life of this lawsuit a crucial piece of evidence and doing so on the final day of fact discovery caused prejudice to Defendants. As one example, the Mission Investigations report names seven previously undisclosed witnesses whose accounts, as recorded by Mission Investigations, contradict critical aspects of the sworn deposition testimony of Plaintiffs Holly Sacks, Melvin Sacks, and Marilyn Proctor. Specifically, the report names Arturo Jimenez, Ricardo, and Jose as witnesses who saw Richard Sacks the night before his death. According to the report,

> At some point between 11:30 and midnight [the night before Richard died], Holly exited the restaurant and met with Arturo and she handed him two bills. He then handed her what the witnesses later learned from Arturo were 'Ecstasy' pills with a cartoon character inscribed on the pill believed to be Bugs Bunny.

(Defendants' mot. at Ex. A).

The testimony of these individuals is critical to understanding what exactly happened in Mexico on the dates in question. This is obviously also critical to Defendants' case and directly impacts the credibility of Plaintiffs. Any evidence that Defendants may wish to obtain from witnesses located in Mexico could be a very lengthy process as Defendants assert it is likely that any testimony or other evidence from these witnesses must be obtained via the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. Defendants further assert that given this

new evidence, the depositions of Plaintiffs, Jeffrey Sacks, Dr. Mitchell, Dr. Fred Del Marva, and

Joachim Fels also need to proceed in the reopened fact discovery phase of this case.

Moreover, Defendants assert Samuel Zamora, the preparer of the Mission Investigations

report, may have made notes, taken photographs or videos, and obtained contact information from

witnesses. Given that this important information is not contained in the Mission Investigations

report, Defendants must now determine if any of this evidence existed. There has been a four-year

delay in obtaining the report, and these preparatory materials may or may not still be available due

to the Plaintiffs' delay in disclosure. The Court finds Plaintiffs failed to produce the Mission

Investigations report timely.

### D.      The Hambright Report

The Hambright report is dated September 6, 2003.  It was provided to Friedman & Feiger and

indicates Hambright Consulting was instructed by Plaintiffs Melvin Sacks, Marilyn Proctor and

Holly Sacks to investigate Richard Sacks' death. (Defendants' reply in support of motion for new

scheduling order and trial date and motion for sanctions at Ex. A, pg. 26).  The purpose of the

investigation was to "secure additional information and documentation surrounding the activity and

participation of any person or organization involved with Richard and Holly Sacks during their trip

to the area in June 2003, and any related information pertaining to the death of Mr. Sacks." *Id.*

The main body of the report corroborates Holly Sacks' testimony that they had purchased

marijuana while in Mexico in June of 2003. Hambright Consulting was advised that the resort

security "had logged a bag of marijuana into the security record, stating that they found it on the

hotel dresser after Mr. Sacks had been taken from the room." *Id.* at pg. 11.  The investigator noted

there was a security log entry, indicating that there was a bag of marijuana found in the Sacks' room,

after Mr. Sacks had been taken to the hospital.  *Id.* at pg. 14.

In addition to the information provided in the original report submitted September 6, 2003, Hambright Consulting provided an Addendum A containing additional information regarding the possible participation of Holly Sacks in securing narcotics during the time in question.  *Id.* at pg. 24. Addendum A provides that Marilyn Proctor had discussed the "drug issues" with Hambright Consulting, and they agreed not to include into the body of the original report these additional facts. *Id.* at pg. 26.

Addendum A corroborates the Mission Investigations report regarding the Sacks' purchase of ectasy while in Mexico in June of 2003.  The Hambright investigator interviewed the van driver, Mr. Glass, who transported Richard and Holly Sacks from the resort to dinner the evening before Richard's death.  According to Addendum A, Glass indicated that "Holly Sacks did in fact provide money to him to purchase the drug known as exstacy (X) [sic].  Mr. Glass denies that he actually *sold* the drug to the Sacks, but he did in fact secure the services of a local dealer to provide the drug to them.  *Id.* at pg. 24 (italics in original).  The Hambright investigator opined that any testimony Mr. Glass might provide is "somewhat suspect, but all factors considered, he would have little to gain by *making up* the information he has provided.  Additionally, some of the subsequent contacts I had in the area after my contact with Mr. Glass tend to make me lend even more credibility to his comments."  *Id.* at pg. 25 (italics in original).

The Hambright report was produced to Defendants on January 22, 2008, the day before the Court's evidentiary hearing.  Plaintiffs' current counsel has had the report since he received the file from Mr. Hart, Plaintiffs' prior counsel. Current counsel made their appearance in this case on behalf of Plaintiffs in early June of 2005.  At the evidentiary hearing on January 23, 2008, Plaintiffs'

counsel explained that he recently reread the Court's December 6, 2007 Order regarding the Mission Investigations report and decided to voluntarily produce the Hambright report.

The Court provides the following timeline regarding the Hambright report.  On November 5, 2004, in response to Defendants' Request for Production No. 37 seeking documents prepared by an investigator, Holly Sacks on behalf of the estate of Richard Sacks objected, asserting work product privilege.  Holly Sacks failed to produce a privilege log.  Her response did not identify any specific report or that an investigator had been hired.[24]  Holly Sacks, in her individual capacity, responded similarly to Defendants' Request for Production No. 26 seeking documents prepared by an investigator.

After Mr. Hart was allowed to withdraw from this case, Plaintiffs' current counsel supplemented Defendants Request for Production Nos. 37 and 26 on August 16, 2007.  Again, Holly Sacks asserted the same attorney work product privilege; no privilege log was filed; and the Hambright report was not identified.

On August 24, 2007, Sacks responded, individually and as representative of the Estate of Richard Sacks, to Defendants' Second Request for Production Nos. 9 and 42 which asked for "any report or finding concerning the circumstances of Richard Todd Sacks death on June 8, 2003."  Sacks filed objections, failed to produce a privilege log, and failed to identify the Hambright report.  No privilege objection was asserted.[25]

---

[24] Defendants state they never learned that Mr. Hart was referring to the Hambright report.

[25] In their response to Plaintiffs' notice of withdrawal of privilege, Defendants provide more examples of discovery requests seeking written statements of any investigator or person claiming to have knowledge of this lawsuit.

Federal Rule of Civil Procedure 26(b)(5)(A) requires that when a claim of privilege or protection of trial-preparation material is made, the party claiming the privilege shall describe the nature of the documents or things not produced in such a manner that will enable other parties to assess the applicability of the privilege or protection.  Again, Plaintiffs failed to do so.  On January 10, 2005, counsel for Defendants challenged the assertions of privilege and requested a privilege log from Holly Sacks' former counsel.  The Hambright report has never been listed in a privilege log. The Court has not been given any excuse or substantial justification for Plaintiff Holly Sacks' failure to identify the existence of the Hambright investigation in a privilege log or for not describing the nature of the Hambright report in such a manner that would have enabled Defendants to question the applicability of the privilege or protection within the fact discovery period. Holly Sacks' Notice of Withdrawal of Privilege fails to offer any good cause of substantial justification for her repeated failure over four years of litigation to disclose the existence of the Hambright report or, at a minimum, to disclose the report in a privilege log.

The information contained in the Hambright report is relevant and critical to the defense of this case. Plaintiffs contend that Richard Sacks had a heart attack based on genetic predisposition and that he could have survived if he received prompt emergency transport and medical services. The new evidence contained in the Hambright report and Addendum A thereto corroborate the information contained in the Mission Investigations report regarding the Sacks' ectasy purchase in Mexico.  Again, the use of unregulated, illicit drugs raises the possibility that no emergency medical response could have saved Richard Sacks.

What's more, Addendum A to the Hambright report reveals that Marilyn Proctor discussed the ectasy purchase with the Hambright investigator, and pursuant to that discussion, Addendum A

32

was submitted separately from the original report with the stated purpose of not including the ectasy information in the body of the original report.  As mentioned above, Marilyn Proctor stated under oath in her deposition taken on October 29, 2007 that she "would be very –very surprised" if Richard used ectasy  "because he would be afraid" to use ecstasy. (Defendants' mot. at Ex. O, pg. 23). When asked if she was aware, on the date of her deposition, that Richard bought elicit drugs in Mexico, Marilyn Proctor answered "no."  *Id.* at pg. 38. Proctor stated that she was aware at the time of her deposition that Richard Sacks had smoked marijuana in Mexico, but no other elicit drugs. *Id.* at pgs. 38-39.  The Hambright report and Addendum A thereto brings into serious question the credibility of Proctor's deposition testimony. As with Plaintiffs' failure to timely produce the Mission Investigations report, the Court finds Defendants were prejudiced by Plaintiffs failure to identify in the nearly four year life of this lawsuit a crucial piece of evidence.

### E.    Conclusion

Federal Rule of Civil Procedure 37 provides that if a party fails to disclose, makes a false or misleading disclosure or refuses to admit information, without substantial justification, or fails to amend the response to discovery under Rule 26(e)(2), the Court may impose appropriate sanctions. FED. R. CIV. P. 37(c).  The Court finds sanctions should be imposed.  The wrongful withholding by Plaintiffs of the Mission Investigations and Hambright reports forces Defendants to move to reopen discovery, depose new witnesses named in the report, and redepose Plaintiffs in this case—subjecting Defendants to significant costs.  With the passage of time, it may be impossible to locate the newly discovered key witnesses.  The whereabouts of those who provided information for the reports may never be ascertained.

The Court has considered whether a sanction less drastic than the dismissal of the lawsuit

33

requested by Defendants would compensate Defendants for the added expense caused by the discovery abuse, compel discovery, deter others from engaging in similar conduct, and penalize Plaintiff, thus fulfilling the purposes of Rule 37.  *See Wouters v. Martin Co.*, 9 F.3d 924, 933 (11th Cir. 1993).  While the Court is tempted to recommend dismissal, the Court determines the following sanctions are appropriate at this time.

Defendants shall be afforded additional time to conduct fact discovery, including the depositions of the authors and the other names contained in the Mission Investigations and Hambright reports.  Defendants shall also be afforded additional time to resume the depositions of Plaintiffs regarding the two reports and to conduct the depositions or continued depositions of Jeffrey Sacks and Dr. Mitchell.  Plaintiffs shall pay Defendants' reasonable attorneys' fees and costs associated with the taking of this additional fact discovery.  The Court orders that both the Mission Investigations and Hambright reports shall be admissible at trial.  Plaintiffs are precluded from issuing any additional written fact discovery.

To the extent certain information is not obtainable given the amount of time since the investigations were conducted, if so warranted, Defendants may later move for a spoliation instruction.  In addition, as discussed in more detail below, the Court finds good cause exists for extending other deadlines contained in the Court's Fourth Amended Scheduling Order dated October 12, 2007.

## V.  DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER

Federal Rule of Civil Procedure 16(b) provides as follows: "A schedule shall not be modified except upon a showing of *good cause* and by leave of the district judge or, when authorized by local rule, by a magistrate judge." (Emphasis added).  The Fifth Circuit has stated four factors trial courts

must consider when determining whether good cause exits to allow a deviation from the court's scheduling order: (1) the explanation for the failure to [meet the deadline]; (2) the importance of the [modification of the deadline]; (3) potential prejudice in allowing the [modification]; and (4) the availability of a continuance to cure such prejudice. *Reliance Ins. Co. v. The Louisiana Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir.1997); *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990).

The Court, having considered the four factors in determining whether good cause exists to allow a deviation from the Court's scheduling order, is of the opinion Defendants' motion should be granted. Defendants have demonstrated good cause for an extension of the fact discovery deadline to May 16, 2008 for the limited purpose of conducting the discovery outlined above.  Defendants' deadline for deposing Plaintiffs' hotel industry expert witnesses Fred Del Marva and Joachin Fels in the Fourth Amended Scheduling Order is extended until thirty days after Plaintiffs provide copies of the amended expert reports of Del Marva and Fels.  Defendants' deadline for designating hotel industry rebuttal experts in the Fourth Amended Scheduling Order is extended to thirty days after Defendants have deposed Plaintiffs' hotel industry experts Del Marva and Fels. Plaintiffs' deadline to depose Defendants' expert witnesses is extended until thirty days after Defendants' deadline for designating hotel industry rebuttal experts.[26]  The final pretrial conference and jury selection dates are continued from the April 2008 docket to September 2 and 3, 2008 respectively.

Utilizing these dates, the parties are instructed to file a joint proposed Fifth Amended Scheduling Order for the Court's signature within fifteen days from the date of entry of this Order.

---

[26] The Court has reviewed the parties' briefing on Defendants' Emergency Motion for Protective Order (Docket Entry # 240-1) and is of the opinion the motion should be granted. Plaintiffs shall re-notice the depositions of Defendants' experts in the cities in which they reside.

35

Based on the foregoing, it is

 **ORDERED** that Defendants' Motion for Discovery Sanctions and to Suppress and Exclude the Oral Sworn Statements of Sergio Farias and Mariana Zardain (Docket Entry # 194) is hereby **GRANTED** as follows:  The Court strikes the oral sworn statements of Farias and Zardain as well as the transcriptions of said statements.  The Court further strikes those portions of the expert reports of Del Marva and Fels which rely on the statements of Farias and Zardain. Del Marva and Fels shall formulate opinions without relying upon or using in any way the contents of the statements. Plaintiffs shall resubmit the expert reports of Del Marva and Fels within thirty days from the date of entry of this Order.  It is further

 **ORDERED** that Emergency - Defendant Four Seasons Hotel Limited and Defendant Four Seasons Punta Mita, S.A. de C.V.'s Motion for New Scheduling Order and Trial Date and Motion for Sanctions (Docket Entry # 208) is hereby **GRANTED** as follows: Defendants shall be afforded additional time to conduct fact discovery, including the depositions of the authors and the other names contained in the Mission Investigations and Hambright reports.  Defendants shall also be afforded additional time to resume the depositions of Plaintiffs regarding the two reports and to conduct the depositions or continued depositions of Jeffrey Sacks and Dr. Mitchell. Plaintiffs shall pay Defendants' reasonable attorneys' fees and costs associated with the taking of these depositions. The Court orders that both the Mission Investigations and Hambright reports shall be admissible at trial. Plaintiffs are precluded from issuing any additional written fact discovery.  To the extent certain information is not obtainable given the amount of time since the investigations were conducted, if so warranted, Defendants may later move for a spoliation instruction. It is further

 **ORDERED** that Defendants' Motion for Protection and Motion for Leave to Extend the

Deadlines in the Fourth Amended Scheduling Order (Docket Entry # 195) is hereby **GRANTED**. The fact discovery deadline is extended to May 16, 2008 for the limited purposes outlined in Section V above. Defendants' deadline for deposing Plaintiffs' hotel industry expert witnesses Fred Del Marva and Joachin Fels is extended until thirty days after Plaintiffs provide copies of the amended expert reports of Del Marva and Fels. Defendants' deadline for designating hotel industry rebuttal experts is extended to thirty days after Defendants have deposed Plaintiffs' hotel industry experts Del Marva and Fels. Plaintiffs' deadline to depose Defendants' expert witnesses is extended until thirty days after Defendants' deadline for designating hotel industry rebuttal experts. The final pretrial conference and jury selection dates are continued from the April 2008 docket to September 2 and 3, 2008 respectively. It is further

 **ORDERED** that the parties shall file, within fifteen days from the date of entry of this Order, a joint proposed Fifth Amended Scheduling Order for the Court's signature. It is further

 **ORDERED** that Defendants' Emergency Motion for Protective Order (Docket Entry # 240-1) is hereby **GRANTED**. Plaintiffs shall re-notice the depositions of Defendants' experts in the cities in which they reside. It is further

 **ORDERED** that Defendant Four Seasons Hotels Limited and Defendant Four Seasons Punta Mita, S.A. de C.V.'s Motion for Leave to Exceed Page Limitations in its Motion for Summary Judgment or for Further Instructions from the Court Regarding the Current Deadlines (Docket Entry # 251) is **DENIED AS MOOT**.

 **SIGNED this 20th day of February, 2008.**

_Caroline M. Craven_
CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE